*In re* MARRIAGE OF VIRGINIA RAMOS, Petitioner-Appellee, and ANTONIO RAMOS, Respondent-Appellant.

First District (5th Division)   No. 83—0890

Opinion filed June 15, 1984.—Rehearing denied August 3, 1984.

Louis B. Garippo, Ltd., of Chicago (Thomas A. Moore, of counsel), for appellant.

Gary E. Dienstag, of Springer, Casey, Haas, Dienstag & Silverman, and Selwyn Blum, of Becker & Becker, both of Chicago, for appellee.

JUSTICE SULLIVAN delivered the opinion of the court:

This appeal is from an order of the trial court finding respondent in wilful contempt for failure to pay petitioner amounts admittedly due to her pursuant to the parties' settlement agreement incorporated in a judgment of dissolution of marriage. Respondent contends that: (1) the provisions in question were not enforceable through contempt proceedings; and (2) the order is improper because (a) the trial court did not find that his failure to pay was wilful and contumacious; and (b) the provision thereof that he could purge himself of contempt by paying $125,000 to petitioner was not based upon his ability to pay.

A judgment of dissolution of the parties' marriage was entered on October 7, 1980, and incorporated therein are the terms of their settlement agreement, which were approved by the trial court. Pursuant thereto, petitioner was awarded the marital home and furnishings therein; three automobiles; and items of personal property. Respondent was awarded his medical practice; sole ownership of the parties'

interest in three buildings, one of which housed his medical practice, an automobile; his personal effects; and any income generated during his lifetime from property owned by the parties in Mexico, with title thereto to be held in trust for the benefit of respondent's children. In addition, respondent agreed to pay outstanding debts incurred during the marriage, including any tax deficiencies for the years 1978, 1979, and 1980, and to "indemnify and hold [petitioner] harmless from any liability therefrom." For her part, petitioner agreed to pay, out of the proceeds of sale, the outstanding $46,000 mortgage on the marital home, as well as a $70,000 note secured by an assignment of the beneficial interest therein, but respondent was to pay her $35,000 within three years as his portion of the liability on the note. The parties further agreed that petitioner would have custody of their minor child; that respondent would pay her $1,000 per month as support until that child reached the age of 18; and that respondent would pay college expenses for their four children. Finally, with regard to maintenance, the agreement provided:

> "On or before six months from the effective date of this agreement, [respondent] shall pay to [petitioner] the sum of [$175,000] without interest, as a lump sum settlement in lieu of alimony or periodic allowance ***."

The payment was to be "in full and complete settlement of all claims or rights held or asserted by [petitioner] for periodic allowance, support or maintenance past, present and future ***." The judgment of dissolution also provided that the terms of the settlement agreement would be binding on the parties "as an order of Court," and that the court retained jurisdiction of the parties and of the subject matter until such time as the judgment was fully satisfied.

On August 25, 1982, petitioner filed a petition for rule to show cause why respondent should not be held in contempt, alleging that he had wilfully failed to pay her the $175,000 due under the agreement as a lump-sum maintenance award; that the Internal Revenue Service had seized $129,000 of her assets as payment of outstanding tax deficiencies; and that respondent had wilfully refused to reimburse her for that amount, in violation of his agreement to indemnify her therefor. In his answer, respondent admitted that the sums were due to petitioner and had not been paid, but denied that his failure to do so was wilful, asserting that he lacked the financial ability to pay.

The rule was entered and, after several continuances, a hearing was held on January 27, 1983, at which respondent, testifying as an adverse witness, acknowledged that he was familiar with the terms of the settlement agreement, which had been drafted by his attorney in

accordance with details that he and petitioner had decided upon; that he had not paid petitioner the $175,000 due thereunder; and that, although he was aware that petitioner's account had been garnished in the amount of $129,000 for outstanding tax deficiencies, he had not reimbursed her therefor as required by their agreement. Respondent further stated that he was a surgeon, had practiced medicine since 1959, and had gross income of approximately $300,000 per year. He also identified a financial statement, prepared in February of 1982 and submitted to Pioneer Bank, which listed assets slightly in excess of $20 million in addition to his income and $10,000 in cash, but denied that the statement was accurate, despite his signature thereon attesting that the information was correct. Respondent further admitted the accuracy of a record of his checking account showing transactions between March of 1981 and October of 1982. That record revealed that deposits were made totaling $790,900, including a $232,000 deposit in March of 1982. Respondent next testified that he purchased a $250,000 house in late 1980 or early 1981, paying $15,000 and financing the remainder; that, at the time of his remarriage in June of 1981, he purchased luggage for $7,000 and flew to Monaco for a honeymoon, although he insisted that the trip cost him only $600; and that he purchased Tol-Tech Corporation, a medical corporation, in March of 1982 for $50,000, but asserted that he did not know the value of that company's receivables, and that the purchase was made in order to use the stock as collateral for a bank loan. He admitted that, in making the latter purchase, he used the name Alforrato rather than his own name, but alleged that he did so because he could no longer obtain credit in his own name. According to respondent, he had a friend named Alforrato living in Mexico, and that Alforrato gave him permission to use that name, but he further stated that he did not know whether Alforrato had any deposits or assets in this country which would establish his credit.

Later, testifying in his own behalf, respondent stated that he had complied with other provisions of the decree, including turning over the marital home and furnishings, as well as three automobiles, to petitioner; paying outstanding debts in the amount of $40,000 to $50,000; and paying college expenses of $40,000 per year for their children. He also asserted that, at the time the settlement was entered into, he expected to receive a $200,000 tax refund for the years 1978 through 1980, which he planned to use to pay petitioner, but he later learned that he owed $250,000 in taxes. Respondent further testified that the checking account identified earlier was his business account, and that there was very little left of his income after disburse-

ments were made therefrom; he did not know what his net profit was, but estimated that he had, at most, $700 left at the end of each month after paying expenses. With regard to the $232,000 deposit in March of 1982, respondent asserted that he was not sure where that money came from, but speculated that it was the proceeds of a loan necessary to pay amounts due to the Internal Revenue Service. Respondent next testified that his real estate had a total value of $450,000, not the $20 million reflected in the financial statement, and that all of the property was mortgaged to its full value; that one building, in which he had a one-half interest, was subject to two mortgages, but he did not know what the equity therein was; that another building he owned had a value of $45,000 to $50,000, but was subject to a $30,000 mortgage; that he was willing to turn over to petitioner all of his real estate and jewelry, which he valued at $100,000, in exchange for a release; that he had borrowed $80,000 against Tol-Tech stock in order to pay taxes; and that he owed $60,000 in taxes for 1981 and 1982.

On cross-examination, respondent acknowledged that the financial statement showed that the building in which he held a one-half interest had a value of $800,000 and was subject to a $100,000 mortgage. He further stated that he had no evidence of the amounts he claimed to have paid to the Internal Revenue Service, and admitted that, although he termed the checking account a "business" account, he paid personal expenses such as his mortgage and the children's college expenses therefrom.

The trial court found that respondent was in contempt of court, and, after several continuances, ordered that he be committed to the Cook County jail for 90 days, but stayed issuance of the mittimus for one month, stating that respondent could purge himself of contempt during that period by paying petitioner $125,000. Respondent's motion to reconsider was denied, and this appeal followed.

OPINION

■ Respondent first contends that contempt was not an appropriate remedy in the instant case, where the provision of the decree to be enforced provided for a lump-sum maintenance award. He acknowledges that section 502(e) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 502(e)) specifically provides that the terms of a settlement agreement which are set forth in a judgment "are enforceable by all remedies available for enforcement of a judgment, including contempt," but argues that, under certain circumstances, the trial court may not enforce a judgment through

contempt proceedings, despite a finding that the failure to comply with the decree's provisions was wilful.

In support of his position, respondent relied solely on *Fox v. Fox* (1978), 56 Ill. App. 3d 446, 371 N.E.2d 1254. There, the trial court had found the respondent in wilful contempt for his failure to abide by provisions of the divorce decree regarding child support payments, and sentenced him to 90 days in jail with the proviso that he could purge himself of contempt by paying the petitioner $2,000. The fifth district reversed that order, adopting the rule followed by courts in other States that, where the children for whose benefit the payments were to be made have reached the age of majority, contempt is not the proper means of enforcing payment of arrearages.

We need not decide here whether we agree with the fifth district's reasoning in *Fox*, for we note that it creates a very narrow exception to the general, long-standing rule, both legislative and judicial, that the terms of a divorce decree may be enforced through contempt proceedings. (See, *e.g.*, Ill. Rev. Stat. 1979, ch. 40, pars. 502(e), 505(b); *Shaffner v. Shaffner* (1904), 212 Ill. 492, 72 N.E. 447 (enforcement of periodic alimony provision); *In re Marriage of Arnold* (1984), 122 Ill. App. 3d 776, 462 N.E.2d 51 (enforcement of provision directing respondent to pay the parties' attorney fees in a prior, unrelated matter); *Stevenson v. Stevenson* (1976), 40 Ill. App. 3d 10, 351 N.E.2d 238 (considering failure to comply with order that petitioner repay a debt and indemnify respondent therefor); *Taapken v. Taapken* (1976), 39 Ill. App. 3d 785, 350 N.E.2d 794 (enforcement of property settlement provisions); *Dobson v. Dobson* (1943), 320 Ill. App. 687, 51 N.E.2d 1010 (abstract of opinion) (failure to make installment payments on lump-sum alimony award).) Here, we are not concerned with past-due child support payments where the children have reached the age of majority, but with maintenance and property settlement provisions, both of which are enforceable through contempt proceedings.

We are also unpersuaded by respondent's argument that contempt was not a proper means of enforcing the settlement agreement in the instant case because, as he asserts, petitioner is "financially affluent." Initially, we note that this argument was not raised in the trial court, and the evidence is insufficient to establish petitioner's financial situation. Moreover, our courts have ruled that the availability to the recipient spouse of alternative means of support does not preclude enforcement of a maintenance award through contempt proceedings (*Shaffner v. Shaffner* (1904), 212 Ill. 492, 72 N.E. 447); thus, a contempt proceeding "is not concerned with the [petitioner's] ability to contribute to her own support" (*Shapiro v. Shapiro* (1969), 113 Ill.

App. 2d 374, 388, 252 N.E.2d 93, 100).

■ Respondent has further argued that he must be granted a new hearing because the trial court "failed to exercise its discretion"; *i.e.*, it erroneously believed that, once it was established that respondent's failure to pay was wilful, it had no alternative but to find him in contempt and impose sanctions therefor. It is respondent's position that the trial court had the power to enforce the judgment through other means, despite the finding that his failure to pay was wilful, and could have denied petitioner access to this remedy. Specifically, respondent argues that the trial court could have entered judgment for the amount due, or could have required petitioner to accept his offer to turn over certain property to her in exchange for a release.

It is our view that the trial court was correct in its assessment. The Illinois Marriage and Dissolution of Marriage Act provides petitioner with a wide range of remedies (Ill. Rev. Stat. 1979, ch. 40, par. 502(e)); she chose to seek the simpler, more expeditious remedy of contempt proceedings rather than resorting to civil execution. It is immaterial that other means of enforcement were available (see *Dobson v. Dobson* (1943), 320 Ill. App. 687, 51 N.E.2d 1010 (abstract of opinion)); in fact, it appears that a petitioner may be entitled to pursue various remedies simultaneously (see *Shapiro v. Shapiro* (1969), 113 Ill. App. 2d 374, 252 N.E.2d 93). Furthermore, the trial court did not have the power to compel petitioner to accept a settlement offer (*Taapken v. Taapken* (1976), 39 Ill. App. 3d 785, 350 N.E.2d 794). We believe that, having found that respondent was in wilful contempt, the trial court would have abused its discretion if it refused to enforce the judgment through appropriate sanctions.

■ Respondent next contends that the order was improper because there was no finding that he was able to pay the amounts due. He admits that, in its written order, the court stated that he was in wilful contempt, but argues that the order inaccurately reflects the trial court's findings, and that it is not supported by the record.

With regard to the first allegation, we note that numerous statements made by the trial court during the course of these proceedings establish that it understood the meaning of the term wilful contempt, and knew what the evidence had to show in order to sustain such a finding. Respondent seeks to impeach the finding set forth in the order by quoting certain statements of the court made after it found him in contempt. However, we have read those remarks in context, as well as in light of the record as a whole, and do not believe that, as respondent suggests, they indicate any doubt on the trial court's part that respondent's failure to pay was not wilful. Instead, they were di-

rected at ascertaining how long it would take respondent to convert assets into cash in order to satisfy the terms of the decree. The trial court did find that those assets were adequate, and its finding is amply supported by the evidence, since there was testimony from which the trial court could have concluded that those assets had a value in excess of $20 million. At the hearing, respondent denied that value, stating that his assets had a value of only $450,000, and that they were mortgaged to their full value. However, it is clear that the trial court did not accept this conclusional, self-serving statement, for it admonished respondent's counsel: "You better get some better evidence than that if you want me to consider it, Counsel. You better give me specifics." No such specifics were provided, and respondent made no attempt to explain the alleged inaccuracy of this financial statement, which was prepared only a few months before the petition for rule to show cause was filed.

Turning to respondent's second argument on this issue, we note that the question whether failure to comply with a judgment was wilful is one of fact (*Palacio v. Palacio* (1975), 33 Ill. App. 3d 1074, 339 N.E.2d 427), and the trial court's finding thereon will not be disturbed unless it is contrary to the manifest weight of the evidence. (*Taapken v. Taapken* (1976), 39 Ill. App. 3d 785, 350 N.E.2d 794.) Here, a *prima facie* showing of contempt was made through evidence that respondent failed to make payments required under the settlement agreement. (*Shapiro v. Shapiro* (1969), 113 Ill. App. 2d 374, 252 N.E.2d 93.) The burden then shifted to respondent to show that his failure to pay was not wilful, but due entirely to his inability to pay (*Shaffner v. Shaffner* (1904), 212 Ill. 492, 72 N.E. 447), since "[i]t is not a contempt of court to fail to pay money which one neither has nor can obtain and which he has not causelessly either put out of his hands or failed to receive" (*White v. Adolph* (1940), 305 Ill. App. 76, 79, 26 N.E.2d 993, 994). However, financial inability to comply with an order must be shown by definite and explicit evidence (*First National Bank & Trust Co. v. Desaro* (1963), 43 Ill. App. 2d 153, 193 N.E.2d 113), and that burden is not met by testimony of a general, indefinite nature with regard to financial status; "where it is sought to show that the failure to pay is due to inability, the party must show, with reasonable certainty, the amount of money he has received since the order was made and that it has been disbursed in the payment of expenses which, under the law, he should pay before making any payment on the decree for alimony." *Hengen v. Hengen* (1915), 271 Ill. 278, 284, 111 N.E. 121, 123.

We have already noted that the trial court could have found that

respondent had assets valued at as much as $20 million; that evidence alone would support the finding that respondent's failure to pay was wilful. In addition, however, it appears that $790,900 passed through his hands between March of 1981 and October of 1982. Respondent testified that a portion of it was used to pay his children's college expenses, taxes, and installments on loans. However, the amounts allegedly expended for these items do not account for even half of the monies admittedly received by him. With regard to the remainder, respondent stated merely that there was very little left after paying "expenses"; there is no evidence of what those expenses were.

In *Hengen v. Hengen* (1915), 271 Ill. 278, 111 N.E. 121, similar testimony was found inadequate to sustain the burden of proving inability to pay. There, the petitioner showed that the respondent owned a large amount of stock and real estate, and had received various sums of money, but had failed to comply with a court order to pay her alimony. In response, the former spouse admitted owning the stock and real estate, but asserted that the stock had little value or had been used as collateral, and that the real estate was encumbered. He further claimed that he was heavily indebted, and that, while he had received various amounts of money since entry of the divorce decree, he had used it to pay living expenses, office expenses, and interest. The supreme court upheld the finding of contempt, noting that his "showing of his property and the money received by him since the decree for alimony and the manner in which the money was expended is of a most general character and wholly insufficient." 271 Ill. 278, 284, 111 N.E. 121, 123.

A similar result was reached in *Shaffner v. Shaffner* (1904), 212 Ill. 492, 72 N.E. 47, where the supreme court, in affirming an order finding that the respondent was in wilful contempt for failure to pay alimony, stated:

> "He does not show what was done with this money except to say that it took it all to pay living and running expenses. This is not sufficiently definite. Estimates and guess-work will not answer. He who seeks to establish the fact that his failure to pay is the result of lack of funds must show with reasonable certainty the amount of money he has received. He must then show that that money has been disbursed in paying obligations and expenses which, under the law, he should pay before he makes any payment on the decree for alimony. It is proper that he first pay his bare living expenses; but whenever he has any money in his possession that belongs to him and which is not absolutely needed by him for the purpose of obtaining the mere

necessaries of life, it is his duty to make a payment on this decree." (212 Ill. 492, 496, 72 N.E. 447, 449.)

We find these cases dispositive, and believe that respondent's testimony, like that in *Hengen* and *Shaffner*, was inadequate to sustain his burden of showing that he was financially unable to make the required payments. Under these circumstances, we cannot say that the finding of wilful contempt was contrary to the manifest weight of the evidence.

■ Finally, respondent contends that the order must be reversed because the portion thereof which provides that he may purge himself of contempt by paying petitioner $125,000 is unsupported by any evidence that he has the present ability to pay that amount.

Where contempt proceedings are employed to compel compliance with a court order made for the benefit of the petitioning party, the sanction imposed is remedial or coercive in nature (*Melbourne Corp. v. City of Chicago* (1979), 76 Ill. App. 3d 595, 394 N.E.2d 1291), and the trial court therefore must specify how the respondent may purge himself of contempt (*Continental Illinois National Bank v. Brach* (1979), 71 Ill. App. 3d 789, 390 N.E.2d 373). Furthermore, where the sanction is imposed in order to compel compliance with an order to pay a specified amount of money, the purging provision must be based on the respondent's ability to pay. *Sullivan v. Sullivan* (1973), 16 Ill. App. 3d 549, 306 N.E.2d 604.

Respondent asserts that no evidence was presented to show how or when he could pay the amount due. However, the record establishes that this lack of evidence was due entirely to respondent's failure to comply with the trial court's repeated requests that he provide that information. Respondent was found in contempt on January 27, 1983, and the trial court on that date asked him how long it would take him to raise the money due, suggesting that a reasonable amount of time might be three months. Despite his assertion in his answer to the petition, filed more than five months earlier, that he would present a payment plan, respondent failed to offer a reasonable estimate of how long it would take him to raise the required amount. The trial court imposed no sanction at that time, but continued the matter for one month with instructions that respondent devise some plan for payment. On the next court date, February 28, 1983, no plan was presented, and the trial court granted a further continuance, directing respondent to present a plan for payment. On March 14, 1983, the parties were again before the court, and when respondent failed to present the requested plan, the trial court entered the order in question, sentencing defendant to 90 days in jail but staying the mittimus

for 30 days to enable respondent to purge himself of contempt by paying petitioner $125,000, noting that "[h]e has property all over here, and he has real estate, and he has a good practice."

The trial court, through the granting of numerous continuances, afforded respondent several months within which to convert his assets to cash, either through sale or other means. It clearly believed that this represented an adequate amount of time, and that respondent had sufficient assets to pay the entire amount due; nevertheless, the trial court repeatedly invited respondent to present some alternative plan. None was offered, and respondent, rather than presenting further evidence of what he could presently pay, chose to stand on his assertions at the January 27 hearing that he had no cash and no assets which could be converted to cash. The trial court rejected that contention and, as we have previously determined, its finding was not contrary to the manifest weight of the evidence. Moreover, there is nothing in this record which would indicate that three months was an inadequate period of time within which to convert some of respondent's substantial assets to cash. Therefore, we do not agree that the purging provision was not based on his ability to pay the amount designated.

For the foregoing reasons, the order of the trial court is affirmed.

Affirmed.

MEJDA, P.J., and LORENZ, J. concur.