*In re* MARRIAGE OF JAMES ELIES, Petitioner-Appellant, and ELIZA-
BETH ELIES, Respondent-Appellee.

First District (6th Division)   No. 1—92—1009

Opinion filed June 30, 1993.

Schiller, DuCanto & Fleck, of Chicago (Sarane C. Siewerth and R. Christopher Ditton, of counsel), for appellant.

Michael A. Haber, of Chicago (Andrey B. Filipowicz, of counsel), for appellee.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Following a protracted temporary support hearing, on September 27, 1991, the trial court issued an order directing petitioner, James Elies, to pay respondent, Elizabeth Elies, $1,500 per month in temporary unallocated maintenance and child support, retroactive to June 24, 1991, and temporary attorney fees totaling $3,000. The foregoing order was based upon the trial court's finding that James, with the assistance of his father, Erwin Elies, manipulated his 1991 income to show a drastic reduction. The order caused James to be $1,071.73 in arrears on the temporary maintenance and child support payments. When he failed to pay the arrearage plus the attorney fees by the court-imposed deadline of March 10, 1992, the trial court issued an order holding him in contempt and remanded him to the custody of the sheriff of Cook County. James secured his release by filing this appeal and posting an appeal bond.

James argues that the contempt judgment must be reversed because the underlying order awarding Elizabeth temporary maintenance and child support of $1,500 per month and $3,000 in temporary attorney fees is against the manifest weight of the evidence.

Elizabeth and James were married on August 24, 1985. They had two children, Lauren and Morgan, born June 9, 1986, and March 16, 1988, respectively. Prior to his marriage to Elizabeth, James pur-

chased a home in Northbrook, Illinois. James and Elizabeth later used this home as their marital residence.

At the time James filed this appeal, he was employed by Berteau-Lowell Plating Works, a Chicago electroplating company, of which his father was president and his grandfather, Herman Elies, was chief executive officer. (At oral argument, James' attorney revealed that James was no longer working for the company.) James was employed by Berteau-Lowell for approximately 12 years. For the last seven years, he had been assigned to the shipping and receiving department, although his father attempted at times to give him additional responsibilities.

Berteau-Lowell is jointly owned by the Elies and Holzendorf families. At some time prior to James' marriage, Erwin placed 430 shares of the company's stock, or 8.5% of the total outstanding, in a trust, naming James as the beneficiary and himself as trustee. Erwin testified that he retained the right to terminate the trust at any time.

On May 21, 1990, James filed his petition for dissolution of marriage. Elizabeth filed her petition for temporary support and maintenance on June 20, 1990, although the parties and their children continued to live together until November 12, 1990. Elizabeth's petition for temporary support and maintenance was first before the trial court on October 3, 1990, and was continued several times. Pending a full hearing on the merits with respect to Elizabeth's petition, the parties entered into an agreement whereby James agreed to pay Elizabeth $200 per week for support. This agreement was reaffirmed in various agreed orders entered by the trial judge.

On a number of occasions, James did not make the required payments. Subsequently, on November 21, 1990, the trial court ordered James to pay Elizabeth $1,200 per month for unallocated spousal support for the months of November and December. When the November order expired on December 31, 1990, Elizabeth filed another petition for temporary support and maintenance. On January 11, 1991, the trial court entered a second order requiring James to pay Elizabeth $250 per week for unallocated support and maintenance.

At the time the January 11 order was entered, James represented that his 1990 net income was $500 per week or $26,000 on an annualized basis. James' 1990 Federal income tax return, however, reflected net income of $42,452. The difference represented the net proceeds of a $22,000 bonus James had received from Berteau-Lowell, $4,533 in interest income, and $733 in dividend income.

The hearing on Elizabeth's petition for temporary maintenance and support commenced on July 22, 1991. The parties stipulated that

James' net income for the years 1988, 1989 and 1990 was $47,340.50, $76,151.20, and $45,521.55, respectively. In those same years, James was paid bonuses of $25,230, $56,100, and $22,975, respectively. The 1989 bonus included an additional $10,000 gift to James from Erwin. All bonuses were voted on by Erwin and William Holzendorf during the last quarter of Berteau-Lowell's fiscal year, which ended on April 30, and were usually paid out in June.

James testified that he earned net income of $500 per week from April 1989 through 1991. Prior to that, his net weekly income was $450. In addition to receiving a weekly paycheck, James received a bonus for each of the four years preceding 1991. James testified that he did not receive a bonus in 1991 because Berteau-Lowell was losing money and had to expend $400,000 on the purchase of a large piece of machinery.

At the time James and Elizabeth separated, James possessed various assets, including a certificate of deposit in the amount of $40,000. After the separation, James redeemed the $40,000 certificate of deposit and used the proceeds to purchase, without Elizabeth's knowledge, two $10,000 college bonds for the parties' children and to refurnish the home after Elizabeth moved out. James testified that he spent more than the remaining $20,000 to refurnish his home because Elizabeth "took everything." Although he was asked to produce receipts for the items he bought, James failed to do so, stating that he was not given enough time to collect them prior to the hearing.

James also liquidated two other certificates of deposit totaling $21,538, which he stated he used to pay bills and to cover his general living expenses. He was unable to provide an exact accounting, however, of how the funds were spent. He testified that he paid $2,000 to Elizabeth's attorney and $5,200 to his former attorney.

James transferred to his father two $25,000 brokerage accounts which his father had opened in James' name to provide additional income to James and Elizabeth on which to live. Erwin testified that he never gave his son the accounts themselves, but only the income from them. In 1991, James made $4,533 in interest income on the two accounts. The accounts were listed in James' name, with his social security number, and the account statements were mailed to his address. However, he stated that he never had access to the funds used to open the accounts. In addition, James sold 400 units of an income trust, which he stated he used to pay support and attorney fees to Elizabeth.

At the time of the hearing, the sole remaining cash asset James possessed was a $14,000 individual retirement account. When ques-

tioned about a $100,000 certificate of deposit his parents had purchased and of which James was named trustee, James stated that he did not know of its existence until informed of it by his former counsel. James testified that he never received any interest income or principal from that investment nor did he know whether the account still existed.

James testified to his monthly income and expenses. He stated that the total of his monthly expenses was $2,829, and that his net monthly income was $2,267, leaving him with a monthly shortfall of $562. He made up for the shortfall by living off the sale proceeds of a nonmarital certificate of deposit.

James owned a 1983 Ford van and also had use of a 1989 Porsche with license plate number "JIM-E." According to James, that license plate number was his at one time, but he released his claim to that number and assigned it to his mother. James stated that the Porsche was purchased by his mother after he located the car at a local Porsche dealership. James traded in a vehicle that was given to him by his parents in exchange for the Porsche. The Porsche cost $18,000 and was purchased in 1991.

Elizabeth, who was living with their children in a two-flat apartment building in Chicago owned by her mother and stepfather, testified that Lauren attended a Catholic school kindergarten and Morgan a Northbrook preschool. Her net monthly support from James was $1,083. This was her sole source of income. Her monthly expenses totaled $2,724, leaving a monthly shortfall of $1,641. She met the shortfall with her parents' assistance. They helped buy clothes for the children, pay grocery bills, meet rent payments, and pay the children's tuition. Elizabeth was formerly employed, but after the birth of Morgan, she and James decided that she would stay home to care for the children.

Erwin Elies testified that he was president of Berteau-Lowell, and, as such, was responsible for the day-to-day activities of the corporation, including the hiring and firing of employees. He paid James a net weekly wage of $500 and had paid him a company bonus in each of the four years prior to 1991. Erwin, his father, James, and Holzendorf each received a weekly check in the same dollar amount. Erwin and Holzendorf jointly determined the amount of the bonus James was to receive each year. Erwin testified that neither he, James nor Holzendorf would receive bonuses for the 1990-1991 fiscal year due to the death of his father. Erwin did not mention the company's loss or the purchase of a $400,000 piece of machinery as reasons why the company did not declare a bonus for James in 1991.

On September 27, 1991, the trial judge entered an order finding that James, with the aid of his father, manipulated his current income to show drastic reductions since the onset of the dissolution action. Consequently, the judge averaged James' income from the previous three years (1988-1990) to arrive at an average gross income figure of $71,249 for 1991. After confirming the parties' monthly expenses about which they had testified, the judge awarded Elizabeth $1,500 per month in temporary unallocated maintenance and child support, or $346.42 per week, retroactive to June 24, 1991. She also ordered James to pay Elizabeth temporary attorney fees of $3,000, without prejudice to the final allocation of fees at trial. James never contested the amount of attorney fees he was directed to pay. As a result of the order, James was immediately $1,071.43 in arrears in support and maintenance due Elizabeth.

On December 12, 1991, Elizabeth filed a petition for rule to show cause, claiming that James had failed to pay either the arrearage or the temporary attorney fees. In addition, James was accumulating additional arrearage of $21.42 per week from September 27, 1991, forward because of a Federal law restricting to 65% the amount of his income that is subject to a withholding order. Thus, while under the order James was supposed to be paying Elizabeth $346.42 per week, she was only receiving $325 weekly. This additional arrearage also remained unpaid.

At the January 29, 1992, hearing, James testified that his sole source of income was his $500 weekly salary from Berteau-Lowell. The hearing was continued to February 14, 1992, and James informed the trial court that he had paid the additional arrearage of $21.42 per week. Still unpaid was the retroactive arrearage in the amount of $1,071.43 and the $3,000 in temporary attorney fees.

Consequently, the trial judge found James to be in willful contempt for failing to pay the temporary allowance and attorney fees, but reserved sanctions until March 10, 1992.

On March 10, when the court was informed that the two amounts, $1,071.43 and $3,000, remained unpaid, the court remanded James into custody. James immediately filed a notice of appeal and posted bond to secure his release. We have jurisdiction over this matter because a judgment of contempt represents a final and appealable order. *In re Marriage of Ryan* (1989), 188 Ill. App. 3d 679, 544 N.E.2d 454.

On appeal, James contends that the judgment of contempt issued against him must be reversed because the underlying order awarding Elizabeth temporary allowances and attorney fees is contrary to the manifest weight of the evidence.

■■ In a contempt proceeding brought during a dissolution of marriage action to enforce an order of child support or maintenance, the failure to make court-ordered payments is *prima facie* evidence of contempt. The party failing to make the allowances ordered has the burden of proving that his failure to comply was not willful or contumacious and that he has a valid excuse for his failure to pay. (*In re Marriage of Hilkovitch* (1984), 124 Ill. App. 3d 401, 464 N.E.2d 795.) Whether the person charged is in willful contempt and whether the sanction is proper are factual matters within the discretion of the trial court. We will not disturb the trial court's finding of willful or contumacious misconduct unless the trial court's factual conclusions are against the manifest weight of the evidence or the record reflects an abuse of discretion. (*In re Marriage of Logston* (1984), 103 Ill. 2d 266, 469 N.E.2d 167.) An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. *In re Marriage of Harding* (1989), 189 Ill. App. 3d 663, 545 N.E.2d 459.

An award of temporary maintenance and child support is dependent upon the financial ability and current circumstances of the parties, but the trial court has considerable discretion in determining the amount of the award. (*In re Marriage of Rogliano* (1990), 198 Ill. App. 3d 404, 555 N.E.2d 1114.) In challenging the underlying order, James contends that the trial court's finding that he, with the assistance of his father, manipulated his 1991 income to show drastic reductions was against the manifest weight of the evidence. We disagree.

We note at the outset that the trial court is in the best position to determine the credibility of the witnesses and to either accept or reject their testimony. (*Hilkovitch*, 124 Ill. App. 3d 401, 464 N.E.2d 795.) Moreover, the trial court is not required to believe even uncontradicted testimony if it is inherently unreasonable or improbable. *Hilkovitch*, 124 Ill. App. 3d 401, 464 N.E.2d 795.

The trial judge heard James testify that he received a sizable bonus from Berteau-Lowell for each of the four years prior to 1991, but that in 1991, while the dissolution-of-marriage proceedings were moving forward, his father and Holzendorf decided not to award bonuses that year. James, who was in no way involved in Berteau-Lowell's management affairs, testified that he did not receive a bonus in 1991 because the company was losing money and had to purchase a costly piece of machinery. Erwin, on the other hand, testified that the reason James was not paid a bonus in 1991 was because his father passed away that year. Besides the fact that no explanation was given regarding how his father's death related to the decision not to give James a bonus, Erwin, who was president and co-owner of the com-

pany, never cited the company's loss or the machinery purchase as a reason for the failure to pay James a bonus.

James argues that it would be "improbable and inherently unreasonable" that Erwin and Holzendorf would agree to forego their own bonuses solely to diminish James' lack of income for "some speculative hearing in 1992." However, a hearing on Elizabeth's petition for temporary support and maintenance was not speculative by the time the decision was made not to award bonuses in 1991. Elizabeth filed her petition on June 20, 1990. Thus, both James and Erwin would have been aware in 1991 that the amount of James' income for that year would be pivotal in the determination of Elizabeth's award. Moreover, the record is not as clear as to Erwin's relinquishment of his own bonus. In fact, Erwin testified that he received an amount of money in addition to his weekly draw "as [he] always do[es]." Although Erwin would not divulge the amount, the trial court was free to infer that his "bonus" was represented by that additional amount of money, and that in fact he relinquished nothing in choosing not to give 1991 bonuses.

With respect to other sources of income available to James prior to 1991, the trial judge heard evidence that in 1988, 1989 and 1990, James received income from two $25,000 brokerage accounts that Erwin had purchased in James' name. It was Erwin's intent that these investments would provide additional income to James and Elizabeth on which to live. Although Erwin testified that he only gave James the income from the two accounts and that the accounts were subject to being withdrawn at his discretion, the manner in which they were held contradicts this claim. The accounts were opened solely in James' name, using his social security number, and the statements were sent to his home address. Moreover, the investment account statements fail to show Erwin as either trustee or custodian of the accounts, and accordingly, Erwin had no legal right to direct the account executive to transfer the assets into his ownership.

James contends that the accounts were listed in his name because it was his father's intent that he pay the income tax due from any income he realized on the accounts. This explanation is undermined by the fact that in 1990, James, not Erwin, showed on his Federal income tax statement a capital loss from the sale of one of the accounts that Erwin claimed was transferred to him. Notably, this sale occurred on December 21, 1990, and the transfer to Erwin of the other account occurred sometime in 1991, well after these proceedings had been initiated.

In addition, the record also reveals that James, or Erwin on behalf of James, misrepresented facts contained in a report which was completed upon the opening of one of James' investment accounts. In this document, dated July 18, 1986, it was represented that James was retired and unmarried, although he was employed and married at the time this document was created.

Finally, the trial court heard testimony regarding the purchase in 1991 of an $18,000 Porsche, bearing license plate number "JIM-E." While James testified that his mother, who drove a Cadillac, purchased the Porsche, he also stated that it was he who found the Porsche and who traded in a vehicle given to him by his parents in exchange for the Porsche. Because James was unable to produce receipts evidencing how he had spent thousands of dollars in 1991 and in view of the license plate number, the trial court was free to reasonably infer, notwithstanding James' testimony to the contrary, that the Porsche belonged to him and not his mother.

■ In view of the foregoing, we conclude that the trial court's finding that James and Erwin manipulated James' 1991 income to reflect a drastic reduction was reasonable and consistent with the manifest weight of the evidence. Accordingly, it was within the trial court's purview to disregard James' reported net income for 1991 because of its inherent unreliability and to employ an alternative method of arriving at an accurate income figure on which to base its award of temporary support and maintenance.

James argues that the trial court erred when it averaged his 1988, 1989, and 1990 income in determining his available income for maintenance and child support. In support of this contention, James cites the recent case of *In re Marriage of Schroeder* (1991), 215 Ill. App. 3d 156, 574 N.E.2d 834. There, the trial court, in determining 1989 net income for the purpose of ascertaining the respondent's child support obligations, averaged weighted business earnings of the respondent's proprietorship for six years 1984 through 1989, using actual income figures for the first five years and a projected income figure for 1989. This court rejected the method used by the trial court because the data relied upon were too old and the projected 1989 income data were unreliable. Consequently, the trial court was directed to calculate the child support award using 1988 net income, which was the most recent accurate income data available.

The circumstances in this case are distinguishable. Here, the data used by the trial court to determine James' 1991 income extended back only three years, and there was no dispute as to the reliability of the income data for those years. In addition, James' income fluctuated

from year to year depending upon the profitability of the family business or the benevolence of Erwin, as evidenced by his net income of $47,341 in 1988, $76,151 in 1989, and $45,522 in 1990. Under these circumstances, the averaging method employed by the trial court was a reasonable means of determining James' current income so as to enable the court to fulfill the purpose of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1991, ch. 40, par. 102 *et seq.*), which is to make reasonable provision for spouses and minor children during and after litigation. Ill. Rev. Stat. 1991, ch. 40, par. 102(5).

We decline to follow the rigid approach to income averaging expressed by the court in *Schroeder*, which would permit income averaging only when a "definitive pattern of economic reversals" over several years is shown. (*Schroeder*, 215 Ill. App. 3d at 161, 574 N.E.2d at 837.) For the reasons stated and under the circumstances presented in this case, we find that the manner in which James' 1991 income was calculated was proper.

■■ James also contends that the trial court incorrectly based its award on James' gross income rather than on his net income, in violation of section 505(a) of the Illinois Marriage and Dissolution of Marriage Act. Section 505(a), pertaining to the payment of child support, provides:

"The duty of support owed to a minor child includes the obligation to provide for the reasonable and necessary physical, mental and emotional health needs of the child.

(1) The Court shall determine the *minimum* amount of support by using the following guidelines:

| Number of Children | Percent of Supporting Party's *Net* Income |
|---|---|
| * * * | |
| 2 | 25% |
| * * * | |

(2) The above guidelines shall be applied in each case unless the court, after considering evidence presented on all relevant factors, finds a reason for deviating from the guidelines. Relevant factors may include but are not limited to:

(a) the financial resources of the child;

(b) the financial resources and needs of the custodial parent;

(c) the standard of living the child would have enjoyed had the marriage not been dissolved;

(d) the physical and emotional condition of the child, and his educational needs; and

(e) the financial resources and needs of the non-custodial parent." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 40, par. 505(a).

James correctly points out that the trial judge, in determining the amount of Elizabeth's award, expressly stated that James' *gross* income for 1991 was $71,249. She then proceeded to order James to pay Elizabeth $1,500 per month in temporary unallocated maintenance and child support and $3,000 in temporary attorney fees. While we agree with James that the $1,500 monthly award does in fact equal 25% of his *gross*, not net, monthly income, we do not agree that the award violates the guideline contained in section 505(a), which requires a minimum of 25% of a payor's *net* income to be paid for the support of two children.

James ignores the fact that the amount awarded to Elizabeth was not only for child support, but was also for maintenance. Thus, it is merely coincidental that $1,500 equals 25% of James' gross monthly income, and the award, therefore, does not violate section 505(a). Although the trial court did not expressly set forth James' net income for 1991, we estimate, based upon a document entitled "Income Analysis—James Elies" contained in the record, that the award represents approximately 32% of his net income. Thus, the trial court met the requirements of section 505(a) requiring that a *minimum* of 25% of James' net income be paid to Elizabeth for the support of the parties' two children.

Section 504 of the Illinois Marriage and Dissolution of Marriage Act permits the trial court to grant maintenance if the spouse seeking maintenance:

"(1) lacks sufficient property, including marital property apportioned to [her], to provide for [her] reasonable needs, and

(2) is unable to support [herself] through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or

(3) is otherwise without sufficient income." (Ill. Rev. Stat. 1991, ch. 40, par. 504.)

The factors to be considered in determining the amount of maintenance, whether temporary or permanent, include the reasonable needs of the spouse seeking maintenance in view of the standard of living established during the marriage, the duration of the marriage, the ability to become self-supporting, the income-producing property of the spouse, and the value of the nonmarital property. *In re Marriage of Cheger* (1991), 213 Ill. App. 3d 371, 571 N.E.2d 1135.

Elizabeth is currently the primary custodian of the parties' two children, and her sole source of income is the unallocated support and maintenance she receives from James. At the time of the temporary support hearing, that amount was $1,083 per month. She has little college education and no special skills to enable her to find appropriate employment at the present time. Nor would her circumstances, given the ages of the children, allow her to seek employment without incurring additional expenses for the care of the children while she was working. Moreover, she is responsible for transporting the children to and from different schools during the week. Elizabeth stated that her living expenses approximated $2,724 per month, including $600 in rent, $169 for utilities, $600 in food for herself and the children, $145 for transportation, and $690 for clothing, grooming, education, medical care, and babysitting for the children. To make up for the $1,641 shortfall, she has had to seek the financial help of her parents, in whose two-flat she resides. During the marriage, Elizabeth and the children enjoyed a considerably higher standard of living.

With regard to James' financial situation, the record reveals that his monthly living expenses approximated $2,829. As we have already found, in addition to earning $500 per week from Berteau-Lowell, James, in the four years prior to 1991, was the recipient of annual bonuses which were apparently unrelated to his performance or the amount of his responsibility at the company. Prior to the commencement of the dissolution of marriage proceedings, James received a consistently high income from Berteau-Lowell for duties which, as Elizabeth points out, could have been fulfilled by someone else at a much lower rate of pay. The trial judge disbelieved James' and Erwin's testimony regarding why, suddenly in 1991, James was not paid a bonus. Accordingly, based on this reasonable credibility determination, the trial judge acted within her discretion in including an average of the three years' bonuses in the income figure for 1991.

In addition, in 1991 alone, James spent more than $40,000 over and beyond the income he derived from his employment, on his own living expenses, for which he was unable to produce receipts. In 1991, he also purchased college bonds for the children totaling in excess of $20,000. He transferred to his father two $25,000 brokerage accounts, and spent proceeds totaling $3,400 from the sale of 400 units of an income trust he owned. He was also the beneficiary of 430 shares of Berteau-Lowell stock, representing approximately 8% of the total outstanding shares.

In light of the foregoing, we conclude that James had the financial resources to meet his needs and those of Elizabeth and their

children to the extent of $1,500 per month in temporary maintenance and support. Similarly, we conclude that his financial resources, in the form of income and income-producing property, were sufficient to pay the $3,000 in fees to Elizabeth's attorney. To justify an award of fees, the party seeking them must show an inability to pay and an ability by the other spouse to pay it. (*In re Marriage of Geis* (1987), 159 Ill. App. 3d 975, 512 N.E.2d 1354.) Elizabeth has shown her inability to pay attorney fees. Moreover, we note that the trial court did not require James to pay all of Elizabeth's attorney fees, but only one-half of what she had requested, and James did not dispute the propriety of this amount.

■ Finally, James argues that the award of temporary child support and maintenance cannot stand because it is of an unallocated nature and does not specify the precise dollar amount of child support, in violation of section 505(a)(5) of the Illinois Marriage and Dissolution of Marriage Act. We disagree. The language to which James refers states that "[t]he *final* order in all cases shall state the support level in dollar amounts." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(5).) In this case, the trial court issued a *temporary* order awarding child support and maintenance pending dissolution of the parties' marriage and entry of a final order. Consequently, the trial court did not err in awarding unallocated child support and maintenance.

■ James' failure to pay the arrearage of $1,071.43 or the temporary attorney fees of $3,000 by the court-imposed deadline of March 10, 1992, is *prima facie* evidence of contempt. (*Hilkovitch*, 124 Ill. App. 3d 401, 464 N.E.2d 795.) Moreover, on the basis of the record before us, we conclude that James has not shown that he has a valid excuse for his failure to pay. Willful contempt exists when the contemnor has funds available to pay pursuant to the court's order, but chooses not to do so. In order for James to establish that his failure to pay is the result of lack of funds, he must show with reasonable certainty not only the amount of money he has received, but also that the money has been used to pay only for the basic necessities of life. (*In re Marriage of Ramos* (1984), 126 Ill. App. 3d 391, 466 N.E.2d 1016.) James has failed to produce any receipts evidencing that the thousands of dollars he spent in 1991 went toward providing for the basic needs of life. The only evidence James offered on this point was his own testimony, which the trial court disbelieved. Because James has failed to prove that his noncompliance was excusable, the judgment of contempt issued against him was proper.

Furthermore, James had from September 27, 1991, until March 10, 1992, to pay the arrearage and temporary attorney fees, or to demonstrate to the trial court that his noncompliance with the order was not willful. He failed to do either. Accordingly, incarceration was an appropriate sanction. See *In re Chesler* (1990), 205 Ill. App. 3d 844, 563 N.E.2d 855.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RAKOWSKI and GIANNIS, JJ., concur.