TERRANCE G. BOYLE, Plaintiff-Appellee, v. JOHN MANLEY, Defendant-Appellant.

First District (6th Division)   No. 1—92—4279

Opinion filed May 27, 1994.

Jones, Day, Reavis & Pogue, of Chicago (Daniel E. Reidy and Irene Savanis, of counsel), for appellant.

Huff & Gaines, Ltd., of Chicago (John L. Huff, of counsel), for appellee.

JUSTICE GIANNIS delivered the opinion of the court:

Plaintiff brought suit in the circuit court of Cook County seeking recovery for property damage sustained to his yacht. Following a bench trial, Judge Willie B. Wright entered judgment in favor of defendant. Judge Wright subsequently granted plaintiff's post-trial motion for a new trial, however, and transferred the matter to Judge John G. Laurie. At the second bench trial, Judge Laurie entered judgment in favor of plaintiff for $2,888.76. In addition, Judge Laurie awarded plaintiff costs in the amount of $1,449.92. Defendant brought this timely appeal pursuant to Supreme Court Rule 303 (134 Ill. 2d R. 303).

In 1987 plaintiff moored his yacht, the Pegasus, in Chicago's Belmont Harbor. Defendant John Manley also kept his yacht, the Tiger, at Belmont Harbor. Belmont Harbor is primarily a harbor used by pleasure boats such as the Tiger and Pegasus and provides direct access to Lake Michigan. The harbor is occasionally used by commercial boats, however, and has been designated a "harbor of refuge" for use by boats in distress or in times of adverse weather. The harbor facilities include a commercial refueling and sanitary pumpout station as well as a harbormaster's office building.

Belmont Harbor's facilities include stationary docks or "slips" for use by boats such as the Tiger and Pegasus. Each slip consists of a steel walkway which juts out about 50 feet into the harbor and is perpendicular to land. These walkways rest on several large steel pilings driven into the harbor bed. The slips also include a cement seawall and steel bulkhead that is attached to the land. Between walkways and about 50 feet from the bulkhead stands a "lonesome piling" which consists of a single steel pipe driven into the harbor bed. The lonesome pilings are evenly spaced between the ends of the walkways and are surrounded by water. A steel cable stretches from the lonesome piling to the bulkhead. Thus, the lonesome piling and the end of the walkway serve to mark the entrance of each slip.

Each slip at Belmont Harbor has at least six mooring points to which a boat could be tied with ropes called "mooring lines." The mooring points consist of steel cleats and three-inch-diameter steel

pipes called "stanchions" which were welded to the deck of the pier, the bulkhead and the lonesome piling. Each slip also has vertical wooden posts attached with bolts to the walkway. These posts run along the walkway at about 12-foot intervals.

Prior to the retrial before Judge Laurie, lawyers for both parties indicated their intention to offer expert testimony. Plaintiff identified his expert, Belmont Harbor harbormaster Michael Oltean. Defendant's attorney stated that he was not yet ready to name an expert and needed additional time. The trial court indicated that the parties might wish to rely upon a recognized treatise in lieu of presenting experts in order to minimize trial costs. Nonetheless, the court granted defendant an extension of time to find an expert. Defendant did not name an expert within the time allowed by Judge Laurie's order. Instead, defendant elected to proceed by relying upon a generally recognized boating treatise, Chapman: Piloting, Seamanship and Small Boat Handling (hereinafter referred to as *Chapman's*).

At trial, Harbormaster Oltean testified both as an occurrence witness and as an expert for the plaintiff. He stated that in early October 1987, a storm with strong winds arose on Lake Michigan. On the morning after the storm he arrived early at Belmont Harbor to check for damage. He found that the stern of the Tiger had broken loose from its mooring, broken through the steel cable and had made contact with the Pegasus. He noticed that the Tiger had been tied on the slip's wooden posts and that one of the posts had broken. He also testified that the rear spring line of the Tiger had been tied high up on a wooden post near the end of the pier.

Oltean pulled the Tiger away from the Pegasus. He saw the port stern and rear spring line still tied to part of a broken post which was floating in the water between defendant's boat and the walkway. He partially lifted the broken post out of the water using the other end of the mooring line that was still attached to defendant's boat. Oltean could not lift it onto the pier. He could, however, see the spot on the post where the rope was tied. He testified that it was a point that was at least three to four feet up from the surface of the pier. A photograph entered into evidence showed the chafe mark that the mooring line had made on the wood.

Oltean stated that, in his opinion, the sole purpose of the wooden posts was to act as fenders so that a boat would not be damaged if it hit the steel pier while entering or exiting the slip. He indicated that the wooden posts were not appropriate mooring points. He testified that prior to the incident involving the two yachts in 1987, he noticed defendant had tied his mooring lines to the wooden posts instead of what he believed were proper mooring points—the steel stanchions

and cleats. He also noticed that defendant had tied his mooring lines high up on the posts. Oltean testified that he warned defendant not to tie to the posts or to the wooden handrails on the walkway; he explained that tying high on the posts increased the leverage on the wood. He also testified to making the same warning to defendant's wife later in the season after noticing that she had also tied the Tiger's mooring lines high on the wooden posts.

Oltean stated that it was his opinion the accident occurred because defendant had moored his boat to the wooden posts and because the mooring lines were tied at such an angle so as to create excessive leverage.

Defendant argues that the trial court's finding in favor of plaintiff is against the manifest weight of the evidence. A reviewing court will not substitute its judgment for that of the trial court unless the trial court's judgment is against the manifest weight of the evidence. (*Central Production Credit Association v. Kruse* (1987), 156 Ill. App. 3d 526, 532, 509 N.E.2d 136; *Williams v. Estate of Cross* (1980), 85 Ill. App. 3d 923, 925, 407 N.E.2d 704.) A trial court's judgment is against the manifest weight of the evidence only when a conclusion opposite that reached by the trial court is clearly evident from the record. *Central Production*, 156 Ill. App. 3d at 532.

Defendant claims that there is no evidence to support a finding that defendant negligently docked his boat in October 1987. He claims that the testimony of harbormaster Michael Oltean which indicated that defendant was negligent in mooring his yacht to the wooden post at Belmont Harbor was patently unreliable and that the recognized authority on the subject of boat mooring, *Chapman*'s, supports his mooring technique. As is repeatedly stated, however, it is the trial court in a bench trial that is in the best position to make a determination as to the credibility of the witnesses and the weight to be afforded their testimony. *In re Marriage of Elies* (1993), 248 Ill. App. 3d 1052, 1058, 618 N.E.2d 934; *White v. Raines* (1991), 215 Ill. App. 3d 49, 60, 574 N.E.2d 272.

In this case, the trial court had ample evidence before it to find in favor of plaintiff. There is nothing in the record to indicate that Oltean testified falsely in stating that the wooden upright was an inappropriate mooring point. Contrary to defendant's position, a review of *Chapman*'s does not establish that tying the Tiger to the wooden posts was appropriate. At best, *Chapman*'s indicates that tying to wooden posts can be proper under certain circumstances. In contrast to the general guidelines provided by *Chapman*'s, Oltean's testimony was specific to the slips at Belmont Harbor and to the wooden post used by defendant to moor his boat. Oltean stated that

the posts were "basically a wrong place to tie up to" and that the posts were "a weak point." These are assertions of fact which support the trial court's judgment.

A reviewing court must consider questions of credibility in favor of the prevailing party and must draw from the evidence all reasonable inferences which support the judgment. (*Village of Niles v. City of Chicago* (1990), 201 Ill. App. 3d 651, 665, 558 N.E.2d 1324; *Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 410, 454 N.E.2d 723.) In light of this standard and in light of the testimony presented by harbormaster Oltean, Judge Laurie's ruling was not against the manifest weight of the evidence.

■ In a related argument, defendant claims the trial court should not have admitted Oltean's testimony because it was "based solely on Oltean's personal experience." Defendant claims Oltean was unqualified to render expert testimony because he had no greater experience in docking a boat than an average boater.

The general principles governing the admission of expert testimony are well established. An expert witness is "a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation." (134 Ill. 2d R. 220(a)(1).) If an expert possesses specialized knowledge that will assist the trier of fact, he may testify concerning that knowledge. (*Lee v. Chicago Transit Authority* (1992), 152 Ill. 2d 432, 459, 605 N.E.2d 493, citing M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 702, at 493 (5th ed. 1990).) Formal academic training or specific degrees are not required to qualify a person as an expert; practical experience in a field may serve just as well to qualify him or her. (*Lee*, 152 Ill. 2d at 459; *Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 37, 541 N.E.2d 643.) "Whether a witness is qualified to testify as an expert rests within the sound discretion of the trial court." *Lee*, 152 Ill. 2d at 459, citing *Schaffner*, 129 Ill. 2d at 36; *Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 250, 302 N.E.2d 257.

In this case, Michael Oltean had the practical experience sufficient for the court to consider him an expert. Supreme Court Rule 220 requires only that Oltean have specialized knowledge greater than that of the "average person," not that of the "average boater" as defendant suggests. Oltean testified that he had been employed by the Chicago Park District (Park District) for 30 years in its marine division and that he had been in charge of all eight harbors run by the Park District. He stated that during his tenure with the Park District he would dock boats approximately 400 to 500 times a

season. Prior to his work with the Park District, Oltean testified that he served for four years in the United States Navy. While in the Navy, Oltean testified that his duties required him to dock vessels at a rate of approximately 60 times per day. He estimated that during his career he had moored marine-type vessels using stern lines, bow lines and spring lines approximately 2,000 times.

Clearly, Oltean was familiar with the proper techniques for mooring a boat and was familiar with the types of forces generated by boats such as the Tiger and Pegasus. Oltean was therefore qualified to testify as to those places appropriate for defendant to tie his mooring lines.

Defendant's reliance on *People v. Owens* (1987), 155 Ill. App. 3d 990, 508 N.E.2d 1088, is unpersuasive. In *Owens*, the appellate court reversed the finding of the trial court finding a police officer qualified to testify as a "blood-spatter analyst." The appellate court in *Owens* noted that blood-spatter analysis had not been recognized as being scientifically reliable and that the State had failed to produce any evidence of the officer's training or experience in this area. In contrast to the facts presented by *Owens*, Michael Oltean testified that he had over 30 years of experience in mooring boats and this testimony was sufficient for the trial court to have relied upon Oltean's testimony in finding defendant was negligent in his choice of where to tie up his mooring lines.

■ In his post-trial motion, defendant offered the affidavit of the current editor of *Chapman's*, Retired Colonel Elbert S. Maloney. Colonel Maloney's affidavit indicates that he believed defendant was not negligent in mooring his yacht to the wooden post and that there is nothing in *Chapman's* to indicate that tying the Tiger to the wooden post was inappropriate. Indeed, Colonel Maloney posits that tying to the metal posts would have constituted negligence in light of the tendency of the lines to slip off "uncapped" mooring points. Nonetheless, the issue remains one of credibility. Credibility issues are not properly resolved in the appellate court.

■ Defendant next argues that the trial court improperly applied Federal maritime law to the facts of this case. Federal maritime law gives rise to a rebuttable presumption that the defendant is negligent if his vessel drifts from its mooring and collides with plaintiff's vessel. (*The Louisiana* (1866), 70 U.S. (3 Wall.) 164, 18 L. Ed. 85; *Weyerhaeuser Co. v. Atropos Island* (9th Cir. 1985), 777 F.2d 1344, 1347; *Patapsco Scrap Corp. v. Maryland Shipbuilding & Drydock Co.* (4th Cir. 1959), 268 F.2d 817.) This issue is a red herring, however, as the trial court specifically stated that it was not relying upon this presumption in rendering its decision. The trial court specifically found that de-

fendant was negligent under both Illinois common law and Federal maritime law.

■ Defendant's final argument is that the trial court improperly awarded $1,449.92 to plaintiff as costs. This was calculated as follows: (1) statutory filing fees ($93); (2) statutory witness fees ($40.12); (3) transcript fees for the parties' depositions and for Michael Oltean's deposition ($800.50); and (4) the fee for the transcription of the first trial held before Judge Wright ($516.30).

Although the general rule is that the parties must bear their own expenses of litigation, sections 5—108 and 5—109 of the Code of Civil Procedure provide that a prevailing party may recover its "costs." (See 735 ILCS 5/5—108, 5/5—109 (West 1992).) These sections do not state, however, what "costs" properly include. (*Falkenthal v. Public Building Comm'n* (1982), 111 Ill. App. 3d 703, 444 N.E.2d 498.) The proper definition of "costs" has been left for the courts to determine. "While the power to impose costs must ultimately be found in some statute, the legislature may grant the power in general terms to the courts, which in turn may make rules or orders under which costs may be taxed and imposed." *Galowich v. Beech Aircraft Corp.* (1982), 92 Ill. 2d 157, 162, 441 N.E.2d 318.

Defendant does not dispute the fact that filing fees and the statutorily allowed witness fees may be recovered under the Code of Civil Procedure. Defendant takes issue, however, with the trial court's award to the plaintiff of deposition fees and the fees necessary to prepare the proceedings of the first trial.

Supreme Court Rule 208 provides that certain expenses relating to depositions may be taxed as costs. (134 Ill. 2d R. 208(d).) The supreme court has stated that this rule authorizes the trial court to tax only those deposition expenses "necessarily used at trial." (*Galowich*, 92 Ill. 2d at 166.) The appellate court has interpreted this to mean that depositions costs cannot be taxed unless the use of the deposition was "indispensable" to the trial, as when a witness dies or disappears. *Cleveland Wrecking Co. v. Central National Bank* (1991), 216 Ill. App. 3d 279, 296, 576 N.E.2d 1055; *Galowich v. Beech Aircraft Corp.* (1991), 209 Ill. App. 3d 128, 142, 568 N.E.2d 46.

In this case, the depositions of the parties and Michael Oltean cannot be fairly characterized as "indispensable" to the trial. Both parties and Oltean were available and actually testified before Judge Laurie. Moreover, there is no authority whatsoever for the court's award of the fees necessary to transcribe the proceedings from the first trial. Plaintiff conceded each of these points at oral argument. For these reasons, the court's award of costs is reduced by a total of $1,316.80 pursuant to our authority under Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)).

The judgment of the trial court is affirmed, although its award of costs is reduced by $1,316.80.

Affirmed in part; reversed in part.

EGAN, P.J., and McNAMARA, J., concur.