RONALD H. GALOWICH, Ex'r of the Estate of Jerald Galowich, Deceased, *et al.*, Plaintiffs-Appellants, v. BEECH AIRCRAFT CORPORATION *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—89—1863

Opinion filed January 4, 1991.—Rehearing denied March 15, 1991.

130

Susan E. Loggans & Associates, of Chicago (David A. Novoselsky, of counsel), for appellants.

Adler, Kaplan & Begy, of Chicago (Richard J. Durden, John W. Adler, John B. Austin, and Georgia Michaels, of counsel), for appellees.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Plaintiffs Ronald H. Galowich, executor of the estate of Jerald Galowich, and Ronald H. Galowich Associates, Inc., brought causes of action in strict liability in tort against defendant Beech Aircraft and

common law negligence against National Flight Service arising from the death of Jerald Galowich in a plane crash at Joliet airport. The jury found for defendants. Defendants filed a motion for costs, and the trial court awarded $7,655.44, of which $5,081.77 was for depositions. Plaintiffs appeal both the trial finding and the award for defendants' costs, asserting jurisdiction pursuant to Supreme Court Rule 301 (107. Ill. 2d R. 301). Defendants cross-appeal, claiming the award of costs below was deficient.

The issues on appeal are whether the trial court abused its discretion in: (1) denying plaintiff's motion *in limine* to exclude evidence of any possible navigational error by decedent during the flight but before the approach to Joliet; (2) instructing the jury on compliance with FAA standards; and (3) allocating defendants' costs to plaintiffs for some depositions while denying costs for others and for *per diem* and mileage expenses of out-of-State witnesses. We affirm in part and reverse in part.

On February 15, 1975, Jerald Galowich was piloting a Beech King Air B-90 from Peoria to Joliet when the plane crashed on approach to the Joliet Airport. The flight had taken approximately one hour. Plaintiffs alleged that this crash was caused by the left propeller going into reverse pitch.

On December 29, 1988, plaintiffs made a motion *in limine* to "exclude evidence that pilot Galowich may have made a navigational error early in the flight."

At trial, defendants presented Frank McDermott, an expert witness, who testified about the contents of the audio tapes of the communications between Jerald Galowich and air traffic controllers on February 15, 1975. Galowich asked for clearance from Peoria to Chicago's O'Hare airport. He received instructions and clearance to fly to Minooka Intersection (near Minooka, Illinois). During the flight, the air traffic controller contacted Mr. Galowich and advised him he was 15 to 20 miles south of the planned course. Galowich went into a holding pattern waiting for clearance into O'Hare, for which he expected a delay of an hour and one-half. Shortly thereafter, Galowich asked for clearance to Joliet Airport instead. During the approach to Joliet, Galowich failed to reply to some of the air traffic controllers' calls, failed to comply with some of the instructions on turns, and flew into Joliet about 100 feet below the prescribed altitude. In McDermott's opinion, Galowich was having problems flying the plane, and that fact was apparent to the traffic controllers.

Four witnesses saw the crash. Two testified that they watched the King Air approach the airport and suddenly go down. Two other wit-

nesses, who were airport employees, stood together and observed the crash. Both observed that the King Air flew in low and three-fourths of a mile to a mile southwest of the approach which the FAA had designed for the runway. This meant that the plane would have to make an extra turn for landing. Both witnesses testified that the plane made an abnormal sound, indicating that the engine was running at higher than normal rotations per minute.

Eyewitness Martin Pegelow also testified that he made a required weather report after the accident. The weather at Joliet was foggy, with high humidity, solid overcast in the sky, and surface visibility of one statute mile.

Defendants also presented James Tilmon, a weatherman and former army and commercial pilot, who gave his opinion of the weather and Galowich's reactions as a pilot. In Tilmon's opinion, when Galowich flew off course and failed to respond to controllers, he exhibited signs of spatial disorientation. As Tilmon defined it, "[s]patial disorientation occurs when a pilot has lost his ability to recognize up, literally to know which direction he's flying or whether he is nose down or right bank or left bank." Mr. Tilmon also testified about special spatial procedures developed for when a pilot who has been flying on instruments must transfer to visual references for landing. He stated that it "is so easy to make some very bad decisions, particularly when you have your ability to see the horizon obscured by snow or smoke or anything else."

Plaintiffs showed that Galowich's failure to respond to some controllers' calls could have been due to transmission problems or communications blind spots between the controllers and Galowich.

The parties presented evidence about two types of FAA approval applicable to the Galowich King Air. Before manufacturing aircraft for sale in the United States, the manufacturer must obtain a type certificate from the FAA approving aspects of design. After manufacture, each individual aircraft needs an airworthiness certificate. The latter can be issued after the aircraft is inspected by employees of the manufacturer.

In this case, the FAA approved the propeller system design for King Air before manufacture. Plaintiffs introduced a letter, dated May 5, 1965, from the FAA advising Beech of special conditions for the propeller reversing system. According to plaintiffs' witness, a special condition must be met before type certification is granted. The witness also read parts of a second letter, dated November 15, 1965, from the FAA to Beech. The letter stated:

"Beech Aircraft Corporation is responsible for tests, fault analysis, and other investigations necessary to assure that failure or malfunction of propeller installation components and propeller control systems provided by Beech or the engine manufacturer will not cause an unsafe flight condition. *** This office plans to make a specific finding that Beech has accomplished sufficient and satisfactory investigations to prevent unwanted propeller reversing. In this regard, Beech may wish to submit results of their investigations to this office at an early date to prevent possible certification delay."

Defendants did not present the specific finding at trial. However, no one disputes that Beech sold the aircraft in the United States, something it could not have done without type certification.

After manufacture, employees from defendant Beech Aircraft submitted information for the airworthiness certification of the particular plane involved.

The following instruction was given to the jury as defendants' instruction No. 54:

"There was in force in the United States at the time of the occurrence in question, and at the time of the type certification of the propeller reversing system on the King Air Aircraft, certain statutes with respect to airworthiness which provided as follows:
***

An applicant is entitled to a type certificate for an aircraft ***, if—
* * *

(b) The applicant submits to the type design, test reports, and computations necessary to show that the product to be certificated meets the applicable airworthiness *** requirements of the Federal Aviation Regulations and any special conditions prescribed by the Administrator, and the Administrator finds—

(1) Upon examination of the type design, and after completing all tests and inspections, that the type design *** meet[s] the applicable airworthiness requirements of the Federal Aviation Regulations or that any airworthiness provisions not complied with are compensated for by factors that provide an equivalent level of safety; and

(2) For an aircraft, that no feature or characteristic makes it unsafe for the category in which certification is requested.

The FAA's special finding of compliance with the special conditions issued by the Administrator relative to the reversing

propeller system on the King Air may be considered by you, together with all the other facts and circumstances in evidence in determining whether or not the aircraft was in an unreasonably dangerous condition, bearing in mind that you may conclude that the aircraft was in an unreasonably dangerous condition notwithstanding its conformance to the Federal Standards."

# I

On appeal plaintiffs contend that the trial court erred in denying plaintiffs' motion *in limine* to exclude evidence of any possible navigational error made by Galowich during the flight but before the fatal landing in Joliet.

■ Relevant evidence is generally admissible. (See, *e.g.*, discussion and citations in *Mueller v. Yellow Cab Co.* (1982), 110 Ill. App. 3d 504, 508, 442 N.E.2d 595.) Evidence is relevant if it tends to either prove a fact in controversy or render a matter in issue more or less probable, and each party may present evidence relevant to his theory of the case or inconsistent with an opponent's theory. *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 240, 529 N.E.2d 525.

■■ Courts will admit evidence of what a party was doing prior to an accident depending on the degree to which that evidence "tends to show what actually or most probably occurred at the time of the [accident]." (*Klavine v. Hair* (1975), 29 Ill. App. 3d 483, 487, 331 N.E.2d 355.) Such evidence is admissible, if "the facts and circumstances support a reasonable inference that the conduct testified to continued from the point of observation to the place of the [accident]." (*Eleopoulos v. Dzakovich* (1981), 94 Ill. App. 3d 595, 600, 418 N.E.2d 980.) Furthermore, the trial court's decision to use or exclude such evidence on the grounds of remoteness will not be overturned on review unless the decision "constitutes a clear abuse of discretion." *Eleopoulos*, 94 Ill. App. 3d at 600.

On appeal, plaintiffs argue that any possible navigational errors made by Galowich earlier in the flight were too remote from the accident to be relevant on the issue of whether pilot error caused the accident. They also argue that circumstantial evidence about lack of due care is only admissible if there are no eyewitnesses to the accident, citing *Balfour v. Citgo Petroleum Co.* (1983), 116 Ill. App. 3d 140, 452 N.E.2d 46, and *Plank v. Holman* (1970), 46 Ill. 2d 465, 264 N.E.2d 12.

Defendants contend that the controllers' tapes tend to prove that Galowich may have been disoriented and unable to function in the weather conditions prevailing on the day of the accident.

At the hearing on the motion for a new trial, the trial court held:

"So, in conclusion, I believe this was evidence having a tendency to prove the likelihood of the defendants' contention that at Joliet, the pilot became spatially disoriented and temporarily confused in making his landing approach, wherein he had to suddenly emerge from solid cloud cover at about a 450 foot level and be momentarily impaired from picking out recognizable landmarks and loss of a definable horizon because of a white-out condition that then existed wherein the sky and earth and buildings all blended together in one color.
   \* \* \*
Of course, the jury could accept or reject the significance of this evidence; \* \* \*. \* \* \* And also, it bore on the competency of the pilot's qualifications with regard to a coping with \* \* \* conditions."

The first question, then, is whether the evidence of Galowich's conduct was so remote from the accident that it should have been excluded. In *Eleopoulos*, the court excluded testimony about a driver looking in his glove compartment near the time of the accident. (*Eleopoulos*, 94 Ill. App. 3d at 600.) In that case, plaintiffs could not establish that looking into the glove compartment caused or contributed to the driver's failure to keep a proper lookout for other cars at the time of the accident. In *Klavine*, the court allowed evidence that a driver was travelling at a "leisurely" rate of speed 600 yards before the accident. In the absence of evidence to the contrary, the court found it likely that the same leisurely speed prevailed until the moment of the crash seconds afterwards. *Klavine*, 29 Ill. App. 3d at 487.

■ In this case, defendants presented evidence of Galowich's conduct for about an hour before the accident, a far longer time than the few seconds allowed in *Klavine*. This evidence, however, does not concern a momentary aberration like a glance into a glove compartment. The evidence tends to show that Galowich was spatially disorientated during the hour before the accident. Indeed, Galowich was off course when he approached the Joliet landing as well as when he left Peoria. Furthermore, Tilmon's testimony indicates that spatial disorientation would have created grave danger as Galowich tried to land in weather conditions with low visibility and no clear horizon.

Thus, the trial court did not abuse its discretion in deciding that defendants' evidence tends to show what actually or most probably occurred at the time of the accident and supported a reasonable inference that the conduct involved continued from the point of observation to the place of the accident.

■ The other question is whether this remote circumstantial evidence can be used when eyewitnesses observed the crash. Under *Plank* (46 Ill. 2d at 468-71), courts may not use evidence about prior conduct or expert reconstruction when eyewitnesses are available. *Plank* and plaintiffs' other case, *Balfour*, both involve car accidents in which an eyewitness might easily observe the path of both cars and the other relevant events. The problem here, however, is that eyewitnesses saw the plane crash but did not observe the cause. Courts do permit testimony about factual issues not addressed by eyewitness testimony. (*Augenstein v. Pulley* (1989), 191 Ill. App. 3d 664, 677, 547 N.E.2d 345, citing *People v. Wolfe* (1983), 114 Ill. App. 3d 841, 848, 449 N.E.2d 980.) In this case, no one directly observed whether Galowich suffered some disorientation at the time of the crash. Indeed, given the nature of plane crashes, eyewitnesses tend to be people who watched from the ground and could not observe any possible confusion or distraction in the cockpit.

For these reasons, we hold that the trial court did not abuse its discretion in admitting evidence about Galowich's conduct during the flight but prior to the actual crash.

## II

Second, plaintiffs claim that the trial court erred in submitting non-pattern jury instruction No. 54, concerning the compliance with FAA standards for the issuance of a type certificate.

■ Each party is entitled to have the court instruct the jury on his theory of the case, provided there is some evidence in the record to support this theory. (*Malavolti v. Meridian Trucking Co.* (1979), 69 Ill. App. 3d 336, 340, 387 N.E.2d 426.) Whenever Illinois Pattern Jury Instructions (IPI) are available, the IPI instruction should be used, "unless the court determines that it does not accurately state the law." (107 Ill. 2d R. 239.) For example, when non-IPI instructions give a mere abstract statement of law without any explanation of its effect on the case, these are not permissible in place of IPI instructions. (*Ryan v. Fleischman* (1978), 64 Ill. App. 3d 75, 78, 380 N.E.2d 1099.) It is, however, within the trial court's discretion to determine the form for jury instructions, and the test of proper instructions is "whether they formulate a clear and adequate picture of the applicable law when viewed in their entirety." *Miceikis v. Field* (1976), 37 Ill. App. 3d 763, 770, 347 N.E.2d 320.

■ In a products liability case, a product's conformity to government standards is relevant but not conclusive on the issue of whether a product is unreasonably dangerous. (*Rucker v. Norfolk Western Ry.*

*Co.* (1979), 77 Ill. 2d 434, 440-41, 396 N.E.2d 534.) A trial court may refuse to instruct juries about product conformity to governmental standards if this instruction would unnecessarily highlight weak evidence. (*Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 305, 443 N.E.2d 575.) But "the jury is capable of giving the proper weight to this type of evidence, and for that reason *Rucker* should not be overruled without further experience with the type of evidence it permits to be introduced." *Moehle*, 93 Ill. 2d at 305.

On appeal, plaintiffs contend that instruction No. 54 was an improper, non-pattern instruction which told the jury to consider the airworthiness certificate as a safety standard. They state further that the instruction only set forth procedures for gaining certification but did not inform the jury of what those standards in fact were. Furthermore, the defendants never presented evidence that the FAA had inspected the aircraft to see if it conformed to standards. In short, plaintiffs argue, the instructions were legally and factually erroneous.

Defendants contend that the instruction refers to the type certificate gained after the FAA had approved the aircraft design prior to manufacture, not the airworthiness certificate given after Beech employees inspected the particular plane involved in the crash. As such, they argue, it properly instructed the jury on evaluating the evidence they presented about type certificates.

The instruction itself refers to "the type certification of the propeller reversing system on the King Air Aircraft." It states the general procedure for obtaining a type certificate and that the King Air design met the qualifications for certification of its reversing propeller system. The instruction further states that the jury should consider the type certificate "together with all other facts and circumstances in evidence *** bearing in mind that you may conclude that the aircraft was in an unreasonably dangerous condition notwithstanding its conformance to the Federal Standards."

At the hearing for a new trial, the trial judge noted the caveat at the end of the instruction. He further observed that the trial had thoroughly developed the procedure of certification for the design type and the fact that changes could be made in the aircraft during the years between type approval and manufacture. He added: "All of these things were put on the scales before the jury ***."

It is clear to us that the instruction referred to type certification. At trial, defendants distinguished the type certificate granted after FAA approval of the King Air design from the airworthiness certificate, granted after some Beech employee checked out the Galowich plane. Plaintiffs also presented witnesses and letters to show that

there were problems with the type certification of the propeller system. At one point, the FAA delegated Beech to oversee design changes. The FAA also stated that Beech must meet the conditions for a specific finding and subsequent type certification. Although the specific finding was not presented at trial, Beech sold the aircraft in the United States, something it could not do without type certification. Further, under the circumstances present, the type certification presumed the specific finding.

█ The instruction told jurors to consider "other facts and circumstances in evidence." Thus, they were told to consider any problems with type certification. Furthermore, the instruction informed jurors that the type certificate was evidence on the subject of product safety, not a conclusive document attesting to this relevant issue.

For these reasons, we find that the trial court did not abuse its discretion in submitting instruction No. 54 to the jury.

### III

Both parties contend that the trial court erred in awarding costs. Plaintiffs state that the court should not have awarded costs for five depositions because the witnesses testified at trial. Defendants state they should have been awarded costs for additional depositions plus costs for mileage and additional *per diems* of out-of-State witnesses.

█ In *Galowich v. Beech Aircraft Corp.* (1982), 92 Ill. 2d 157, 165-66, 441 N.E.2d 318, the court defined costs as "allowances in the nature of incidental damages awarded by law to reimburse the prevailing party, to some extent at least, for the expenses necessarily incurred in the assertion of his rights in court." At common law, a successful litigant could not recover the costs of litigation from his opponent. Therefore, any recovery of costs depends on statutory authorization and is limited to the items allowed by statute. *Galowich*, 92 Ill. 2d at 162.

█ Under section 1–105 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 1–105), the supreme court may provide by rule for the assessment of costs. Section 1–106 (Ill. Rev. Stat. 1989, ch. 110, par. 1–106) further provides:

"This Act shall be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties. The rule that statutes in derogation of the common law must be strictly construed does not apply to this Act or to the rules made in relation thereto."

The awarding of costs and fees, however, "is discretionary with the trial court and will not be disturbed on review absent a clear abuse of

discretion." *Perlman v. Time, Inc.* (1985), 133 Ill. App. 3d 348, 355, 478 N.E.2d 1132.

In Rule 208(d) (107 Ill. 2d R. 208(d)), the supreme court provided that deposition "fees and charges may in the discretion of the trial court be taxed as costs." The *Galowich* court interpreted Rule 208(d)

> "as authorizing the trial court to tax as costs, in its discretion, the expenses only of those depositions necessarily used at trial.
>
> This interpretation of the rule accords with this court's frequent statements that a successful litigant is not entitled to recover the ordinary expenses of litigation. [Citations.] The deposition as used in modern litigation is almost entirely a technique of trial preparation, serving primarily the convenience of counsel. Though there may be instances in which a discovery deposition would become a necessity—as when a crucial witness died or disappeared before trial—it is difficult to say that all or even most of the depositions routinely taken in preparation for trial are necessary." *Galowich*, 92 Ill. 2d at 166.

The court noted further: "There has been considerable discussion recently of the tendency of counsel to overuse discovery methods, especially in large cases. [Citation.] We agree with the courts that have found it undesirable to encourage increased deposition taking *** with the prospect that the expense may eventually be recouped in an award of costs." (92 Ill. 2d at 166-67.) The court held: "Since the test for when the expense of a deposition is taxable as costs is its necessary use at trial, it follows that Rule 208(d) cannot be authority for the assessment of a defendant's deposition expenses against a plaintiff who voluntarily dismisses his case before trial." *Galowich*, 92 Ill. 2d at 167.

To date, courts have followed *Galowich* in refusing to allow deposition costs when plaintiffs dismiss the case (*In re Petition of the Village of Kildeer to Annex Certain Territory* (1989), 191 Ill. App. 3d 713, 722, 548 N.E.2d 654), but have not defined exactly what constitutes necessary use for depositions when a case does go to trial. *In re Marriage of Lefler* (1988), 185 Ill. App. 3d 677, 686, 542 N.E.2d 1.

Plaintiffs argue that *Galowich* found that the use of depositions in court was necessary only "when a crucial witness died or disappeared before trial." (*Galowich*, 92 Ill. 2d at 166.) Plaintiffs cite *Lefler* (185 Ill. App. 3d at 685-86), and *Village of Kildeer* (191 Ill. App. 3d at 722), as recent cases following *Galowich* and holding that depositions must be actually "used" at trial before the court will award deposition costs. Therefore, since the court awarded deposition costs for five wit-

nesses who appeared in court, the court exceeded the limits of *Galowich* and improperly applied a liberal construction to a statute enacted in derogation of the common law, citing *Gehrke v. Gehrke* (1901), 190 Ill. 166, 60 N.E. 59. In short, plaintiffs argue that the court erred in awarding any costs for depositions.

Defendants argue, by contrast, that *Galowich* merely presented two examples of when depositions would be necessary and did not intend the examples to be limits. In the case here, for example, defendants argue that they needed depositions to enforce Rule 220 (107 Ill. 2d R. 220) during the examination of expert witnesses. Defendants note that in *Lefler*, the court awarded deposition costs for "depositions used at trial" without inquiring about the nature or necessity of that use. (*Lefler*, 185 Ill. App. 3d at 686.) Defendants also cite the Code of Civil Procedure's provision for liberal construction (Ill. Rev. Stat. 1987, ch. 110, par. 1—106) and argue that the trial court construed Rule 208 too strictly.

Defendants further ask that we award additional costs for depositions. First, they ask for costs for all defense witnesses who testified even though the depositions were never mentioned in the transcript on the ground that these depositions were necessary to protect their clients at trial. Second, even if they do not get costs for other witness depositions, they request costs for two depositions which were referred to during witness testimony. Third, defendants claim that they should be awarded costs for 61 unnecessary depositions of their employees taken by the plaintiffs in an effort to harass defendants into settlement. Defendants argue that the reasoning of *Galowich*, against the "overuse" of depositions, requires that courts award costs when one side abuses the deposition process.

Defendants cite no additional cases in support of their specific requests for additional deposition costs.

■ As Rule 208 clearly states, expenses of the winning litigant's depositions "*may* in the discretion of the trial court be taxed as costs." (Emphasis added.) (107 Ill. 2d R. 208.) Thus, arguably, the trial court is free not to award any deposition costs provided that such exclusion is not an abuse of discretion. In this case, the court denied costs for all depositions which were not actively used in court. We do not find any abuse in this action.

This leaves the issue of deposition costs which were awarded. *Galowich* (92 Ill. 2d at 166) suggested that "there may be instances" when a discovery deposition is "a necessity—as when a crucial witness died or disappeared before trial." That court did not, however, define necessity. The trial court awarded $5,081.77 for five

"[D]iscovery depositions, necessarily used at trial, and I equate necessarily used at the trial with being used either for impeachment purposes or to refresh the recollection of a witness or for admissions; in other words, where there was an affirmative used [*sic*] at trial which would reflect itself in the record."

██ The *Galowich* test is two-pronged. Use at trial in itself is not sufficient. In order for deposition expenses to be taxed to the losing litigant, the deposition must be necessary. A necessity is something that has the condition or quality of being necessary, that is "indispensable" or "needed to achieve a certain result." (The American Heritage Dictionary 834 (2d ed. 1982).) Defendants argue that because the depositions in question were used to impeach or refresh recollection they were *ipso facto* necessary. We disagree. If a witness admits making a contradictory statement during a deposition, we fail to see why it is *necessary* to use the deposition at trial. Likewise, we do not believe that any attempt to refresh recollection, no matter how minor the issue, is a necessary use.

To accept defendants' arguments would cause parties to attempt to impeach or refresh recollection on the most remote issues in an effort to recover deposition costs. Trial judges would be compelled to spend hours, or even days, in assessing the validity of parties' claims.

██ It is apparent from a reading of the *Galowich* opinion that the supreme court was attempting to discourage the taxing of deposition costs. The opinion sets forth two examples where a deposition would become a necessity. While we do not hold these reasons exhaustive, we believe that a circumspect application of Rule 208 is mandated by an examination of the *Galowich* opinion. There the court acknowledged that courts have not been uniform in their definition of necessary use at trial. The court then cited to a number of cases, including a case wherein deposition costs were held recoverable for such use as refreshing recollection and correcting a witness' answer. (*Galowich*, 92 Ill. 2d at 164.) Yet, in listing the examples of where deposition use is necessary, the court referred only to the more narrow situation of crucial witnesses dying or disappearing before trial. We have examined the record and fail to see why the five depositions used at trial were "indispensable."

For these reasons, we hold that the trial court's award of $5,081.87 for five depositions used at trial was an abuse of discretion.

Defendants also contend that the trial court erred by declining to award costs involving out-of-State witnesses for days they were in the county before their testimony and for mileage.

■■ Under section 47 of "An Act concerning fees and salaries" (Ill. Rev. Stat. 1987, ch. 53, par. 65):

> "Every witness attending in any county upon trials in the courts shall be entitled to receive the sum of $20.00 for each day's attendance and 20 cents per mile each way for necessary travel. For attending in a foreign county, each day's travel shall constitute a day of attendance."

Courts may allow these statutory fees even if the witness did not testify and do so at "the sound discretion of the trial court." *Lorsch v. Gibraltar Mutual Casualty Co.* (1970), 127 Ill. App. 2d 350, 362, 262 N.E.2d 313.

■■ Under *Fish v. Farwell* (1889), 33 Ill. App. 242, 244, "[w]e have no statute which authorizes the allowance or payment of mileage for travel outside the State to witnesses in civil cases. Costs were not given at common law, and are not taxable or recoverable when not awarded by statute." However, courts may award statutory fees for distance travelled by witnesses within the State, as if they had travelled from another county within the State. *Doppelt v. Columbia Paper Stock Co.* (1901), 99 Ill. App. 207, 209.

After the trial, defendants applied for costs and submitted affidavits attesting to the mileage and attendance of out-of-county witnesses. On appeal they submit that the statute allows for a *per diem* for each day that a witness was in the county for the purposes of the trial. They contend that the court should ignore the antiquated precedents of *Fish* and *Doppelt* and award both in-State and out-of-State mileage for their out-of-State witnesses. Finally, they argue, section 1—106 (Ill. Rev. Stat. 1987, ch. 110, par. 1—106) requires a liberal construction of allowable costs.

Plaintiffs argue that the statutory language "witnesses attending in any county upon trials" allows fees only for days when the witness attended the trial, not for preparation time. They also note that *Fish* and *Doppelt* are still good law.

■■ At the hearing on costs, the judge reviewed his trial notes and awarded the *per diems* only for days "each witness occupied the courtroom chair testifying in this courtroom," weekends between testimony days for out-of-State witnesses, and "an appropriate number of days for travel time."

None of the parties cites any authority, nor are we aware of any, for the proposition that attendance in the county is the same as attendance at trial. The trial court awarded *per diems* for days when witnesses actually testified and for out-of-State travel. Any decision

to make additional *per diem* awards would be only at the court's discretion.

The trial court relied on *Fish* in denying defendant mileage costs for out-of-State witnesses. The law of this case has not been changed by statute, and we will not impose a liberal construction of the general statutory provisions to replace the trial court's discretion in this matter.

We do note, however, that calculations of the in-State mileage for out-of-State witnesses were relatively simple in the era of *Doppelt* when witnesses traversed the State by road or rail. These same calculations would be difficult and meaningless for witnesses who fly into Chicago, whose direction in the air is determined by weather and whose total mileage could include miles logged in a holding pattern over O'Hare.

For these reasons, we hold that the trial court did not abuse its discretion in denying additional *per diems* and travel mileage for out-of-State witnesses.

For the reasons stated, we affirm the trial court's denial of the motion *in limine*, find no error in the instruction to the jury or the denial of additional *per diems* and travel costs, but we reverse the allowance of deposition costs.

Affirmed in part and reversed in part.

McNAMARA and EGAN, JJ., concur.