KATHLEEN MAFFETT *et al.*, Plaintiffs-Appellants, v. THURMAN J. BLISS *et al.*, Defendants-Appellees.

Fourth District   No. 4—01—0569

Argued January 24, 2002.—Opinion filed April 23, 2002.

COOK, J., specially concurring.

Thomas E. Herr (argued), of Law Offices of Herr & Herr, of Pontiac, for appellants.

Peter W. Brandt (argued) of Livingston, Barger, Brandt & Schroeder, of Bloomington, and Michael F. Coles, Livingston, Barger, Brandt & Schroeder, of Champaign, for appellees.

JUSTICE STEIGMANN delivered the opinion of the court:

In August 1998, plaintiffs, Kathleen and Matthew Maffett, sued defendants, Thurman and James Bliss, for injuries Kathleen sustained when her minivan collided with a bean head attached to James' combine, which was being driven by Thurman. (A bean head is a 21$\frac{1}{2}$-foot-wide raised steel platform used to harvest crops.) Following a January 2001 jury trial, the jury returned a verdict in favor of the Blisses and against the Maffetts.

The Maffetts appeal, arguing that (1) the trial court erred by (a) excluding the testimony of certain witnesses regarding the fog and visibility near the time of the accident, (b) refusing to allow rebuttal evidence regarding visibility and fog, (c) allowing evidence regarding Kathleen's prior vision problems, (d) permitting the Blisses to cross-examine one of the Maffetts' expert witnesses using various journal articles without having timely disclosed those articles during discovery,

(e) permitting the Blisses to impeach one of the Maffetts' expert witnesses with a note the witness had written to himself regarding Kathleen's symptoms of post-traumatic stress disorder, (f) allowing the Blisses to cross-examine one of the Maffetts' expert witnesses regarding Kathleen's postaccident alcohol consumption, (g) allowing the Blisses to cross-examine the Maffetts regarding Kathleen's postaccident legal gambling activities, and (h) denying the Maffetts' motions for a new trial and for judgment notwithstanding the verdict (judgment *n.o.v.*); (2) the Blisses' counsel violated the court's order barring evidence that police had not ticketed Thurman for a traffic violation as a result of the accident; and (3) James violated the court's order barring evidence regarding the Blisses' financial status. We reverse and remand for a new trial.

## I. BACKGROUND

On the morning of October 14, 1996, Kathleen was driving her minivan west on 1600 North Road in McLean County. At the same time, Thurman was driving James' combine east on 1600 North Road. At around 7:35 a.m., Kathleen's minivan collided with the combine's bean head, which was raised between two or four feet off the roadway and hanging over into Kathleen's lane of traffic. The collision occurred over a culvert with cement side abutments and yellow-and-black-striped obstacle signs marking the sides of the culvert. As a result of the collision, Kathleen sustained very serious injuries.

In August 1998, the Maffetts filed a four-count complaint against the Blisses, alleging (1) negligence on the part of both Thurman and James (counts I and II) and (2) loss of consortium (counts III and IV), which they later amended.

The evidence at the January 2001 jury trial showed the following. On October 14, 1996, Kathleen woke up at 6:30 a.m. She typically left her house at 7:15 a.m. However, on that morning, she left her house earlier than usual after noticing that it was foggy. Kathleen secured her son in her car, turned on her headlights, and began driving to her baby-sitter's house. On the way there, the fog got "thicker." After dropping off her son, Kathleen put her seat belt back on, backed out of the baby-sitter's driveway, and drove west on 1600 North Road toward the site of the accident. Due to head trauma sustained in the accident, Kathleen did not recall anything that happened after backing out of the baby-sitter's driveway.

As a result of the accident, Kathleen sustained fractures of her forehead, nose, jaw, left hand, wrist, and forearm; severe facial lacerations, a concussion, and damage to her femoral nerve. She has permanent facial scarring, was unable to bend her left wrist, and lost her

senses of taste and smell. Kathleen also stated that since the accident, she had experienced episodes of confusion and panic, and she had been diagnosed with post-traumatic stress disorder. She further stated that because of her injuries, she was unable to enjoy certain hobbies and ordinary activities.

On cross-examination, Kathleen acknowledged that she had encountered combines over culverts on previous occasions. In those situations, either she or the farmer stopped before the culvert and allowed the other person to pass. She also acknowledged that a reasonable person would reduce her speed where visibility was "somewhat reduced" on a country road during harvest season. Kathleen further stated that she had prior vision problems.

Louis Saunier, a volunteer firefighter, testified that at around 7:45 a.m. on October 14, 1996, he was working at his body shop in Cooksville when he received an emergency call regarding the accident. He drove about four minutes to the accident scene and tried to stabilize Kathleen until other emergency workers arrived.

Royce Kraft, a volunteer firefighter and farmer, received a page at 7:58 a.m. that morning regarding the accident. He arrived at the scene around 8:11 a.m. and observed that the combine's bean head was resting on the minivan and Kathleen was pinned in the van.

Paula Hammond, a volunteer emergency medical technician, was at her home in Anchor sometime before 8 a.m. when she received an emergency call regarding the accident. She drove to the fire station in Colfax and then rode in an ambulance to the accident scene. Hammond stated that it took her a little longer than usual to get to the fire station that morning because of the fog, and when she arrived at the accident scene, it was "very foggy." Upon arriving on the scene, Hammond helped stabilize Kathleen until emergency workers extricated her from the minivan. Kathleen was then transported by helicopter to the hospital.

Robert Brown, a sergeant with the McLean County sheriff's department, received a call sometime between 8:30 a.m. and 9 a.m. on October 14, 1996, to go to the accident scene and reconstruct the accident. When he arrived at the scene about 30 minutes later, he noted that it was "very foggy." After discussing the accident investigation with other police officers, Brown formulated the opinion that based on the fog and the location of the accident, "the head on the combine was protruding into the van's lane." He also stated as follows: "I knew it was very foggy on my way [to the accident scene] and just in my mind, I kind of thought fog might have something to do with this accident."

Brown acknowledged that he did not know what the visibility conditions were like when the collision occurred. He also stated that if

a witness testified that visibility at the time of the accident was one-quarter mile (1,320 feet), he would have no reason to dispute the witness. Brown did not have an opinion regarding what the weather conditions were at Thurman's house when Thurman left on the morning of the accident.

Carl Boyd, a sergeant with the McLean County sheriff's department, was called to the accident scene from Bloomington. Although he did not recall what time he arrived, he remembered that he was delayed because it was very foggy. When he arrived at the scene, it was "very thick with fog." Boyd noticed that the minivan was facing west and was far over to the right side of its lane. The combine was facing east and the bean head was across the entire width of the roadway. According to Boyd, Thurman told him that the fog was patchy and appeared to get worse when Thurman turned onto 1600 North Road on the morning of the accident.

Boyd acknowledged that he was not near the scene of the accident when it occurred, and he did not know what the weather conditions were at that time. He also stated that if Thurman testified that visibility at the time of the accident was one-quarter mile, Boyd would have no reason to dispute that testimony.

William Kinsella testified that on the day of the accident, he lived approximately 870 feet from the accident site. He stated that 1600 North Road was a blacktop, rural road that was busy from around 6:30 a.m. until 8:30 a.m. Soon after the accident, Thurman knocked on Kinsella's door and told him about the accident. Kinsella telephoned 9-1-1, and then he and Thurman drove to the accident scene, which was about two or three minutes away. Kinsella stated that it was foggy as they drove to the scene. After they arrived at the scene, emergency workers began arriving within about two minutes. Thurman told Kinsella that weather conditions were clear when Thurman left his house that morning.

Peggy Bliss, who was married to Thurman in October 1996 (they had since divorced), testified that between 5:30 a.m. and 6 a.m. on October 14, 1996, James called Thurman and asked him to drive the combine from Peggy and Thurman's house in rural Towanda to one of James' fields. Peggy was concerned about the "patchy fog" and asked Thurman to wait until the fog lifted. James called about 45 or 50 minutes later and asked Thurman why he had not left. When Thurman left shortly thereafter, Peggy noticed that it was still "foggy, patchy."

Peggy acknowledged that on the morning of the accident, she could "kind of see" her neighbor's house, which was about one-quarter mile away from her house. She also acknowledged that she was six miles

from the accident scene at the time the accident occurred, and she did not know what the weather conditions were like when the collision occurred.

Dr. Robert Aherin, a farm safety expert at the University of Illinois, testified as the Maffetts' expert that an operator of a combine has the right to transport his equipment on public roadways. Combine operators also have a responsibility to assure that (1) the combine is readily recognized as a piece of farm equipment through lighting, markings, and visibility; and (2) other vehicle operators are allowed to use their traffic lane free from obstruction. Aherin stated that it is not reasonable to expect farmers to move equipment during the harvest season when it is foggy. He opined that if a careful and prudent combine operator encounters fog where visibility is not good (that is, less than 1,000 feet), he should move off the roadway if the combine is protruding into the oncoming traffic lane. Aherin also stated that even though no state law or regulation requires lighting on the bean head itself, safety experts have long recommended that when someone is moving equipment that is wider than the main transporting unit, lights should be placed on the extremities of the unit, particularly on the far left. The lighting should be adequate enough to allow approaching drivers to determine the width of the equipment.

Aherin also testified that the portion of 1600 North Road near the accident site was a fairly level roadway with a wide shoulder on most portions of the road. He stated that there were adequate places to pull over a combine along the roadway. Aherin acknowledged that if visibility were at least 1,000 feet, it is within regulation and appropriate for a farmer to move his combine from one field to another on a country roadway without removing the bean head. He also acknowledged that if visibility were at least 1,000 feet, an approaching driver would have sufficient time to see and react to a combine.

Dr. Ronald Ruhl, a professional engineer and an accident reconstruction expert, testified as the Maffetts' expert that 1600 North Road is a secondary road that is 16 feet wide. (A normal two-lane road is 24 feet wide.) He stated that there are two creeks near the portion of the road at the accident site, which makes the area conducive to fog formation. Ruhl also stated that the combine had lights on the cab but no lights or reflectors on the bean head. He estimated that prior to the accident, Kathleen was traveling between 40 and 50 miles per hour. He further estimated that at the time of the collision, her speed was less than 10 miles per hour, if not zero, and her minivan was near the other side of the culvert. Upon impact, the combine was just starting to cross the culvert, and the force of the impact pushed Kathleen's minivan back five or six feet.

Ruhl opined that the cause of the accident was the "ambushing" of Kathleen's minivan by the combine, which had moved into the center of the roadway within about four seconds and blocked the entire roadway with the bean head. Ruhl explained that the term "ambush" means that the combine had an unlit bean head and headlights on the cab that were spaced laterally at approximately the same distance as a truck's headlights. This configuration resulted in confusion to approaching drivers, who would perceive a normal width vehicle in the oncoming lane. Ruhl opined that Kathleen did not do anything that caused the accident.

Ruhl acknowledged that it would have been acceptable for Thurman to operate the combine on the roadway if visibility was 1,000 feet. He also acknowledged that if visibility was 1,000 feet at the time of the accident, Kathleen could have seen the combine's headlights.

Several physicians, including Dr. Stephen Sabol, an oral and maxillofacial surgeon, Dr. Herman Dick, a neurologist, and Dr. Chris Dangles, an orthopedist, testified about Kathleen's various injuries and their treatment of her following the accident.

Dr. Douglas Bey, Kathleen's treating psychiatrist, testified that on June 22, 2000, he sent Kathleen a letter setting out what she had told him during their first session. That letter stated, in part, that Kathleen had told Bey that she lost her peripheral vision and had a blind spot in her left eye. Bey further stated that his review of Dick's reports and deposition indicated that "there was no restriction on [Kathleen's] driving."

Thurman testified that he left his home sometime before 7 a.m. on October 14, 1996. He intended to drive the combine to James' field near Cooksville. Thurman turned on the combine's lights, including two flashing amber lights. When he left his house, visibility was about one mile. When he was about two miles away from the accident site, it became foggy. When he turned onto 1600 North Road, it was still foggy, with visibility more than one-quarter of a mile. Thurman stated that he met two cars on the roadway and pulled off to let them go by without any problems.

When Thurman first saw Kathleen's minivan, he was two or three seconds, or about 50 feet, away from the culvert. He kept his eyes on Kathleen's headlights, slowed down, and got in the middle of the road to cross the culvert. As he approached the culvert, he slowed down to four or five miles per hour and calculated that he could get across the culvert and out of the way before Kathleen's vehicle reached the culvert. When he realized the oncoming vehicle was not going to stop in time, he stopped the combine and was trying to shift it into reverse when the collision occurred. Thurman expected the oncoming vehicle

to slow down because that was what usually happened when a vehicle approached his combine. He assumed that if he saw approaching vehicles, the drivers of those vehicles also saw the combine. Thurman did not notice the oncoming vehicle slowing down and did not realize until after the accident that Kathleen left skid marks measuring 137 feet.

Thurman acknowledged that the bean head stuck out into the oncoming traffic lane and did not have any lights on it. He[i] also acknowledged that when he encountered fog on the morning of the accident, he decided to continue because he "could see fine." Just prior to the accident, he saw headlights coming over a hill that was one-quarter mile away from the culvert. Although he did not know how fast Kathleen was traveling, he believed that she was "going at a high rate of speed." Thurman further acknowledged that he was not sure whether the combine was stopped, barely moving forward, or barely moving backward at the moment of impact. He denied having pulled off the roadway earlier that morning because of the foggy conditions.

Dr. Daniel Metz, a professional engineer in vehicle dynamics and accident reconstruction, testified for the Blisses that (1) there was not enough physical evidence to conduct "any kind of a serious [accident] reconstruction;" and (2) based on his review of the physical evidence, no one was at fault in this accident. Metz opined that no one could "actually reconstruct the events of that morning [of the accident] in terms of fog density to perfection." He also opined that it was appropriate for Thurman to have the combine on the roadway at the time of the accident. Metz based that opinion on Thurman's testimony that visibility was one-quarter mile at the time of the accident. Metz also stated that the flashing amber lights on the cab of the combine made the combine more conspicuous. Metz stated that he did not agree or disagree with Ruhl's opinion that the combine ambushed Kathleen's minivan.

Metz acknowledged that the configuration of lights on the front of a combine could fool oncoming drivers regarding the width of the vehicle they were approaching.

On this evidence, the jury returned a verdict in favor of the Blisses and against the Maffetts. This appeal followed.

## II. ANALYSIS

### A. The Maffetts' Claim That the Trial Court Erred by Refusing To Allow the Testimony of Saunier, Kraft, and Hammond Regarding Their Observations of the Fog and Visibility

The Maffetts first argue that the trial court erred by refusing to allow the testimony of Saunier, Kraft, and Hammond regarding their

observations of the fog and visibility near the time of the accident, both as they approached the accident scene and at the scene. In response, the Blisses argue that the proffered testimony was cumulative and not relevant. We agree with the Maffetts.

### 1. *The Proffered Testimony*

The Blisses filed a motion *in limine* seeking to exclude "any and all testimony regarding visibility immediately before and at the time of the accident, except testimony from the parties *** [and] any testimony regarding the visibility that existed at any time subsequent to the accident." The trial court reserved its ruling on the motion until the Maffetts proffered their witnesses.

At trial, the trial court refused to admit the testimony of Saunier, Hammond, and Kraft regarding their observations of the fog and visibility near the time of the accident, as they approached the accident scene, and at the scene. The court determined that this testimony was not relevant because the proffered witnesses (1) were not present at the scene at the exact time of the accident to observe the fog and visibility, and (2) did not observe the fog and visibility along the specific route Thurman traveled on the morning of the accident. (During Brown's testimony, the trial court stated that it had reconsidered its ruling and allowed Brown to testify regarding visibility and fog at the accident scene upon Brown's arrival. The court later allowed Boyd and Kinsella to testify as to their observations of the fog and visibility at the accident site.)

Saunier testified in an offer of proof that he was the first emergency worker to arrive on the scene several minutes after the collision. He was in Cooksville, which was four minutes north of the accident site, when he received the emergency call. He testified that visibility en route to the scene was between 100 and 120 feet because the roads south of Cooksville were "shrouded with fog." When he turned onto 1600 North Road, he found that it also was "fogged in." His top speed driving to the scene was 45 miles per hour. The poor visibility did not improve and was consistent as he drove to the accident site.

Hammond, an emergency medical technician, testified in an offer of proof that as she approached the accident site from the west, the fog "closed in" on her. She arrived on the scene a couple of minutes before she first took Kathleen's vital signs at 8:10 a.m. Hammond stated that a helicopter out of Peoria would not fly to the accident scene because of the fog and lack of visibility. A helicopter flown in from Champaign had trouble locating the accident site and had to be guided in by voice because of the limited visibility. Hammond could not recall when that helicopter arrived.

Kraft testified in an offer of proof that just before 8 a.m. on the morning of the accident, he left his house in Normal and traveled to the accident site. As he got closer to the scene, the fog became "thicker." As he got nearer to the accident site, there were spots where visibility was 100 feet or less. When he arrived at the scene at 8:11 a.m., visibility was one-eighth of a mile. He also stated that a helicopter had a difficult time landing because of the fog. Kraft, who is a farmer, would not have taken his combine out on the road "probably" because of the poor visibility.

## 2. Analysis

■ Generally, each party is entitled to present evidence that is relevant to its theory of the case. *Koonce v. Pacilio*, 307 Ill. App. 3d 449, 463, 718 N.E.2d 628, 639 (1999). "Evidence is relevant if it tends to either prove a fact in controversy or render a matter in issue more or less probable ***." *Galowich v. Beech Aircraft Corp.*, 209 Ill. App. 3d 128, 135, 568 N.E.2d 46, 50 (1991). Further, negligence may be established by using either direct or circumstantial evidence. Circumstantial evidence is the proof of facts and circumstances from which a jury may infer other connected facts that usually and reasonably follow, according to their common experience. *Barker v. Eagle Food Centers, Inc.*, 261 Ill. App. 3d 1068, 1072, 634 N.E.2d 1276, 1279 (1994). The admission of evidence lies within the trial court's discretion, and a reviewing court will not disturb the trial court's ruling absent an abuse of discretion. *Koonce*, 307 Ill. App. 3d at 463, 718 N.E.2d at 639.

■ Weather reports and observations are generally held to be admissible in most jurisdictions. See generally D. Feld, *Weather Reports and Records as Evidence*, 57 A.L.R.3d 713, § 3 (1974). This rule is followed in Illinois. See *Loughnane v. City of Chicago*, 188 Ill. App. 3d 1078, 1081, 545 N.E.2d 150, 152 (1989). Weather reports and observations have been held to be admissible where they had a tendency to refute testimony of the weather conditions on a particular date, even though readings or observations were not made at the exact moment of the accident. See *Chicago & Northwestern Ry. Co. v. Trayes*, 17 Ill. App. 136, 140-41 (1885) (holding that because the weather conditions on the night of accident were "material as bearing upon the question of *** negligence," weather observations taken at intervals during the day and night, both before and after the accident, should have been admitted). In addition, the distance from the location of the weather observations to the accident scene affects only the weight, not the admissibility, of the weather reports and observations. *Loughnane*, 188 Ill. App. 3d at 1081, 545 N.E.2d at 152; see *Celanese Corp. v. Van-*

*dalia Warehouse Corp.*, 424 F.2d 1176, 1180 n.2 (7th Cir. 1970) (citing cases). Moreover, lay witnesses' observations of weather conditions, including fog and visibility, have been held to be admissible. See 1 R. Steigmann, Illinois Evidence Manual § 7:03, at 360 (3d ed. .1995) ("Opinions of ordinary witnesses have been received about \*\*\* the state of the weather and like facts \*\*\*"); D. Feld, *Admissibility of Nonexpert Opinion Testimony as to Weather Conditions*, 56 A.L.R.3d 575 §§ 2, 3 (1974); see also *Williams v. Graber*, 485 N.E.2d 1369, 1375 (Ind. App. 1985) (in which the Indiana Appellate Court held that the fact that a police officer described weather and road conditions 25 minutes after the accident went to the weight to be accorded the testimony and not to its admissibility).

The issues of visibility and fog were of critical importance and highly disputed in this case. We agree with the Maffetts that the jury could have reasonably inferred from the testimony of Saunier, Hammond, and Kraft (regarding their observations of the visibility and fog near the time of the accident, both as they approached the accident scene and at the scene) that Thurman's assessment of the fog and visibility before and at the time of the collision was improbable. We recognize that the record shows that Saunier arrived on the scene approximately 15 minutes after the accident, and Hammond and Kraft arrived within about 35 or 40 minutes of the accident. However, the mere fact that the witnesses were not present at the exact moment the accident occurred does not require exclusion of their testimony.

■ We conclude that this evidence was sufficiently relevant under the facts of this case that it should have been admitted. The weight and value to be given this evidence should have been left to the trier of fact. See *Hiscott v. Peters*, 324 Ill. App. 3d 114, 125, 754 N.E.2d 839, 849 (2001). Accordingly, we hold that the trial court abused its discretion by refusing to allow the testimony of Saunier, Hammond, and Kraft regarding their observations of the fog and visibility near the time of the accident, as they approached the accident scene, and at the scene.

However, we cannot conclude that the trial court abused its discretion by refusing to admit Hammond's and Kraft's testimony regarding the difficulty that one of the helicopters had in landing. Neither Hammond nor Kraft testified in the offer of proof as to when that incident occurred.

In so holding, we reject the Blisses' contention that the proffered testimony of Saunier, Hammond, and Kraft regarding the fog and visibility was merely cumulative of the testimony of Brown, Boyd, and Kinsella, which the trial court allowed after reconsidering its ruling. The proffered testimony was sufficiently different in terms of the time

and place of their observations, as well as their descriptions of the fog and visibility, as not to be repetitive. Further, a claim that evidence was cumulative is less persuasive in a case like this, in which the plaintiff is unable to remember the events leading up to the accident. See generally *Ostendorf v. International Harvester Co.*, 89 Ill. 2d 273, 284, 433 N.E.2d 253, 258 (1982) (determining whether evidence is cumulative of other evidence involves a determination whether the "new" evidence adds anything to what was already before the jury).

Because the issues of visibility and fog were of such critical importance in this case, we conclude that the trial court's refusal to admit the testimony of Saunier, Hammond, and Kraft regarding their observations of the visibility and fog near the time of the accident, both as they approached the accident scene and at the scene, prejudiced the Maffetts. This prejudice was demonstrated during closing argument, when the Blisses' attorney commented that there was "no evidence that the [Maffetts] ha[d] presented that [Thurman's] assessment of the situation was wrong." The Blisses' attorney also argued repeatedly that the Maffetts had offered no explanation as to why Kathleen had not seen the combine.

We further conclude that the prejudice to the Maffetts was exacerbated by the trial court's refusal to allow Saunier, Hammond, and Kraft to testify on rebuttal regarding their observations of the visibility and fog near the time of the accident, as they approached the accident scene, and at the scene. Such testimony would have directly contradicted the testimony of Thurman and Metz regarding visibility at the time of the collision. See *People ex rel. Mendez v. Villa*, 260 Ill. App. 3d 866, 870, 632 N.E.2d 322, 324 (1994) (rebuttal evidence is admissible "if it tends to explain, repel, contradict or disprove the testimony of a witness").

### B. The Maffetts' Claim That the Trial Court Erred by Admitting Evidence Regarding Kathleen's Prior Vision Problems

The Maffetts also argue that the trial court erred by admitting evidence regarding Kathleen's prior vision problems. We agree.

■ Initially, we reject the Blisses' claim that the Maffetts have forfeited this issue on appeal by failing to object to Bey's testimony regarding Kathleen's prior vision problems. Although the Maffetts did not object to Bey's testimony, they objected to Kathleen's testimony regarding her prior vision problems. In addition, the forfeiture doctrine is an admonition to the litigant, not a limitation on the authority of the reviewing court. *Harris v. Cropmate Co.*, 302 Ill. App. 3d 364, 367, 706 N.E.2d 55, 59 (1999). We thus address the Maffetts' argument on the merits.

■ Irrelevant evidence is not admissible. *Clemons v. Mechanical Devices Co.*, 292 Ill. App. 3d 242, 251, 684 N.E.2d 1344, 1350 (1997), *aff'd*, 184 Ill. 2d 328, 704 N.E.2d 403 (1998); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 402.1, at 188 (7th ed. 1999) (hereinafter Handbook of Illinois Evidence). Even relevant evidence may contain drawbacks of sufficient importance to call for its exclusion, including unfair prejudice, confusion of the issues, and misleading the jury. Handbook of Illinois Evidence § 403.1, at 189; see *Gill v. Foster*, 157 Ill. 2d 304, 313, 626 N.E.2d 190, 194 (1993) ("Even relevant evidence may be excluded if its probative value is substantially outweighed by such factors as prejudice, confusion, or potential to mislead the jury"). Thus, if a piece of evidence has slight probative value, any prejudicial effect on the jury may require exclusion. "Moreover, if the evidence is merely confusing and creates uncertainty, that alone may suffice to tip the balance in favor of exclusion when the information sought to be presented contains negligible probative value." *First Midwest Trust Co. v. Rogers*, 296 Ill. App. 3d 416, 430, 701 N.E.2d 1107, 1116 (1998); see also *Demos v. Ferris-Shell Oil Co.*, 317 Ill. App. 3d 41, 53, 740 N.E.2d 9, 18 (2000) ("even if the evidence is arguably relevant it may still be excluded if it would confuse the issues or tend to mislead the jury").

Further, as this court stated in *First Midwest Trust*, 296 Ill. App. 3d at 430, 701 N.E.2d at 1116:

"One of the tests that a trial court may use when evaluating relevance is to ask how it would view this evidence if it were the trier of fact. Would the proposed evidence assist the trial court in resolving questions of fact? See *Yamnitz v. William J. Diestelhorst Co.*, 251 Ill. App. 3d 244, 250, 621 N.E.2d 1046, 1050 (1993) (offered evidence is relevant if it renders a matter in issue more or less probable in light of logic and experience). If not, then the evidence should be excluded."

■ Judged in accordance with this test, we conclude that the trial court should have excluded the evidence of Kathleen's prior vision problems. Kathleen testified that (1) she had seen a physician for a "vision problem" in her left eye and that three physicians had noted the problem but could do nothing for it; and (2) in 1993, she had blurry vision in her left eye, which cleared up in three or four months and never returned. Bey testified that in June 2000, Kathleen had reported to him that she had lost peripheral vision and had a blind spot in her left eye. In light of the fact that (1) the evidence of Kathleen's "vision problem" did not demonstrate what the problem actually was; (2) the evidence of her loss of peripheral vision and a blind spot in her left eye did not demonstrate (a) when she suffered those

problems, (b) the exact nature and extent of those problems, or (c) how those problems affected her vision; (3) the evidence of blurry vision in her left eye did not recur after 1993 (three years before the accident); (4) Kathleen was a licensed driver; and (5) the only evidence before the trial court (from Dick's evidence deposition) demonstrated that Kathleen's prior vision problems were not severe enough to restrict either her driving or her ability to see the combine on the morning of the accident, we conclude that the evidence of Kathleen's prior vision problems contained negligible probative value. This evidence would have assisted the jury only marginally—if at all—in resolving the issues in this case. We further conclude that the negligible relevant import of the evidence was substantially outweighed by its prejudicial impact on the jury. We agree with the Maffetts that the evidence of Kathleen's prior vision problems was likely to confuse and mislead the jury or result in speculation on the jury's part. Indeed, the trial court itself recognized that the prejudicial effect of this evidence was "pretty significant." Accordingly, we hold that the trial court erred by admitting evidence regarding Kathleen's prior vision problems.

We find support for our holding in *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 57, 733 N.E.2d 1275, 1279 (2000), in which the supreme court rejected the "same part of the body rule," describing it as "nothing more than a bright-line relevancy standard" that improperly presumes that a previous injury is automatically relevant to the present injury simply because it affects the same part of the body. The court held that such evidence was admissible only if it was shown to be relevant, a requirement that would usually require expert testimony:

> "In most cases, the connection between the parts of the body and past and current injuries is a subject that is beyond the ken of the average layperson. Because of this complexity, we do not believe that, in normal circumstances, a lay juror can effectively or accurately assess the relationship between a prior injury and a current injury without expert assistance. Consequently, we conclude that, if a defendant wishes to introduce evidence that the plaintiff has suffered a prior injury, whether to the 'same part of the body' or not, the defendant must introduce expert evidence demonstrating why the prior injury is relevant to causation, damages, or some other issue of consequence. This rule applies unless the trial court, in its discretion, determines that the natures of the prior and current injuries are such that a lay person can readily appraise the relationship, if any, between those injuries without expert assistance." *Voykin*, 192 Ill. 2d at 59, 733 N.E.2d at 1280.

The *Voykin* court concluded that evidence that the plaintiff had complained of " 'neck problems' " " 'secondary to playing hockey

since he was 6' " should have been excluded because (1) the evidence did not demonstrate what the plaintiff's " 'neck problems' " were or when he suffered from them; and (2) nothing about the evidence had "any tendency to make it less likely that defendant caused plaintiff's neck injury or that defendant caused plaintiff to suffer damages." *Voykin*, 192 Ill. 2d at 60, 733 N.E.2d at 1281. The court further noted that without expert testimony establishing both the nature of the plaintiff's " 'neck problems' " and the relationship between those prior problems and the plaintiff's current claim, an average juror could not readily appraise the effect of the prior problems upon the plaintiff's current claim. *Voykin*, 192 Ill. 2d at 60, 733 N.E.2d at 1281.

Similarly, in this case, (1) the evidence of Kathleen's "vision problem" did not demonstrate what the problem actually was; and (2) the evidence of her loss of peripheral vision and a blind spot in her left eye did not demonstrate (a) when she suffered those problems, (b) the exact nature and extent of those problems, or (c) how those problems affected her vision. Moreover, the only evidence before the trial court demonstrated that Kathleen's prior vision problems were not severe enough to restrict either her driving or her ability to see the combine on the morning of the accident.

Like the issues of fog and visibility, Kathleen's ability to see the combine on the morning of the accident was a crucial and greatly disputed issue in this case. We thus conclude that the trial court's erroneous admission of evidence regarding Kathleen's prior vision problems prejudiced the Maffetts and denied them a fair trial. The following comments of the Blisses' attorney during closing argument simply heightened that prejudice:

"I mentioned earlier that the [Maffetts] haven't told you anything or given you a reason why [Kathleen] didn't see the combine. Dr. Bey in his note, his letter to [Kathleen] did.

[Kathleen] told Dr. Bey that she had no peripheral vision and he wrote that down twice in his report. He told—she told us on the stand that she has a blind spot in her left eye. Ask yourself ladies and gentlemen, is it reasonable conduct? Is it reasonable for a person with no peripheral vision, with a blind spot in their [*sic*] left eye, to be traveling down a road at fifty miles an hour during harvest when she acknowledges there are combines and implements on the road? Given those circumstances, ask yourself, has the plaintiff proven a case against [the Blisses] that [Thurman] is at fault for the fact that he is traveling four miles an hour and she is traveling at least fifty miles an hour down a country road with that type of vision problem?"

Accordingly, we reverse and remand for a new trial.

## III. ISSUES ON REMAND

Although we have determined that this case must be remanded for a new trial, the Maffetts raise other issues that may arise on remand. We address those issues separately.

### The Maffetts' Claim That the Trial Court Erred by Permitting the Blisses To Cross-Examine Bey Using Various Journal Articles

█ The Maffetts also argue that the trial court erred by permitting the Blisses to cross-examine Bey using various journal articles without having timely disclosed those articles during discovery. We disagree.

Contrary to the Maffetts' contention, Supreme Court Rule 213(g) does not require that a party disclose journal articles that the party intends to use in cross-examining the opposing party's opinion witness. Indeed, none of Rule 213's disclosure requirements applies to cross-examining an opposing party's opinion witness. See 177 Ill. 2d R. 213(g). The Maffetts cite no case law holding that a party must disclose articles to be used solely during cross-examination. In this regard, we agree with what the appellate court wrote in *Southern Illinois Airport Authority v. Smith*, 267 Ill. App. 3d 201, 206, 641 N.E.2d 1240, 1244 (1994):

> "If the cross-examiner, to use a cliché, must telegraph his punch, cross-examination would lose its effectiveness. If complete disclosure is the optimum, would it not be more in the spirit of full disclosure to require the 'cross-examiner' to submit his questions to the opponent's witnesses prior to trial? By eliminating the spontaneity, we would certainly avoid surprises. We may also be limiting the ability to ascertain the truth."

The case upon which the Maffetts rely, *Iser v. Copley Memorial Hospital*, 288 Ill. App. 3d 408, 680 N.E.2d 747 (1997), is inapposite. During direct examination of the plaintiff's expert in that case, the plaintiffs attempted to elicit testimony concerning the authoritative nature of certain journal articles. *Iser*, 288 Ill. App. 3d at 409-10, 680 N.E.2d at 748. The appellate court held that the plaintiff's expert witness could not give a new opinion that was contrary to his deposition testimony. *Iser*, 288 Ill. App. 3d at 412, 680 N.E.2d at 750. The *Iser* court did not address the use of journal articles for purposes of cross-examination.

## IV. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand for a new trial consistent with the views expressed herein.

Reversed and remanded.

KNECHT, J., concurs.

JUSTICE COOK, specially concurring:

I disagree with the majority's statement that "none of Rule 213's disclosure requirements applies to cross-examining an opposing party's opinion witness." 329 Ill. App. 3d at 577. Rule 213, as amended March 28, 2002, effective July 1, 2002, specifically recognizes that freedom to cross-examine is subject to a restriction that in multiple-party cases a cross-examiner may not elicit undisclosed information from the witness of a party with which he is aligned. Official Reports Advance Sheet No. 8 (April 17, 2002), R. 213(g), eff. July 1, 2002. I believe amended Rule 213 clarifies the existing rule and does not change it.

Other situations may also present problems. If plaintiff decides on the day of trial not to call a witness he has previously disclosed, and defendant calls the witness instead, is plaintiff freed from compliance with Rule 213 during his cross-examination? If defendant calls a treating physician whom he has previously disclosed, and the court eventually determines that the witness is hostile and may be examined "as if under cross-examination" (188 Ill. 2d R. 238(b)), may the defendant continue his questioning, his "cross-examination," free of the restrictions imposed by Rule 213?

Consider another hypothetical situation closer to the facts of this case: defendant has a theory that he would like to introduce by way of an expert treatise; defendant chooses not to use his own expert to discuss the treatise because he would then have to disclose the treatise under Rule 213; instead, defendant introduces the treatise by cross-examining plaintiff's treating physician. (Amended Rule 213 recognizes that treating physicians may be independent, not strongly aligned with the plaintiff who calls them.) The focus of amended Rule 213 is away from bright-line rules and toward doing substantial justice between the parties, with trials decided on the merits. I suggest that, in the examples given, the trial court has discretion not to allow the testimony.

There is a tension in these cases between providing full and fair discovery and exclusion of evidence simply to enforce meaningless technicalities. The solution is not bright-line rules but a trial court which understands the objectives of Rule 213 and is able to apply them to the unique facts before it.